# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

**QUINTEZ WREN HODGES**                                                      **PETITIONER**

**v.**                                                                    **No. 1:07CV66-MPM**

**CHRISTOPHER EPPS, ET AL.**                                              **RESPONDENTS**


## MEMORANDUM OPINION AND ORDER

Quintez Wren Hodges, the petitioner in this cause, was convicted of the capital murder of Isaac Johnson in the Circuit Court of Lowndes County, Mississippi, on September 13, 2001. He was sentenced to death. Petitioner appealed to the Mississippi Supreme Court, which rejected his claims of error. *See Hodges v. State*, 912 So.2d 730 (Miss. 2005), *cert. denied*, 546 U.S. 1037 (2005) ("*Hodges I*"). Petitioner then filed a post-conviction petition, which was also rejected. *See Hodges v. State*, 949 So.2d 706 (Miss. 2006), *cert denied*, 522 U.S. 1061 (2007) ("*Hodges II*"). Petitioner filed the instant petition for writ of habeas corpus on February 27, 2008.[1] Having reviewed the pleadings, the State court record, and having held an evidentiary hearing in this cause, the Court finds that confidence in the outcome of the sentencing portion of Petitioner's trial has been undermined. Petitioner's sentence of death is vacated for the reasons stated herein.

---

[1] Petitioner initially raised sixteen separate claims for relief in his petition. He withdrew claims XI and XIV during the course of these proceedings. Petitioner also conceded that he would not be entitled to relief under claim XII under current precedent, and the Court considers that claim abandoned, as well. The Court will not address these claims in the body of its opinion.

# FACTS[2]

Petitioner shot and killed Isaac Johnson in Isaac's home during the early morning hours of July 21, 1999. The circumstances that culminated in Isaac's death span a time period of two years and revolve around the relationship between Petitioner and Cora Johnson, Isaac's younger sister. Cora and Isaac Johnson lived with their mother, Bessie Tatum, in Lowndes County, Mississippi. Cora was introduced to Petitioner through Isaac, who played basketball with Petitioner. In the summer of 1997, Petitioner, then sixteen, began having a romantic relationship with thirteen year old Cora. Cora became pregnant later that year.[3] Approximately four months into the relationship, Petitioner began breaking into Bessie Tatum's [hereinafter "the Johnson"] home to see Cora. According to Cora, she ended the relationship in January 1998 when Petitioner refused the family's repeated demands that he stop breaking into the home.

In May of 1998, Cora and her mother came home to find Petitioner hiding under Cora's bed. He was arrested, and Ms. Tatum executed a victim impact statement that asserted that she did not feel safe with Petitioner in her family's life. (*See* Pet. Memo Ex. 5). Petitioner pled

---

[2] The State court trial record in this cause contains twenty consecutively numbered volumes. The first twelve volumes are designated as "State Court Papers," hereinafter "SCP Vol. ___." Volumes thirteen through twenty are designated as "Trial Transcript Volumes," hereinafter "Trial Tr. Vol. ___, ___." In addition, one volume contains the report of the trial judge. Petitioner's direct appeal and post-conviction records have also been filed with the Court. Any reference to Petitioner's direct appeal pleadings are hereinafter designated "Pleadings Vol.," while references to the briefs filed during the pendency of Petitioner's direct appeal are designated "Briefs Vol.". There are eight consecutively numbered volumes of Petitioner's post-conviction proceedings, which are hereinafter designated "PCR Vol. ___." The Court notes that volume five of Petitioner's post-conviction pleadings was not filed with the Court.

[3] Cora gave birth to the baby, Annasheika, on September 16, 1998. At the time of Annasheika's birth, both Petitioner and his family believed him to be the father of the child. DNA tests later confirmed that he is not.

guilty to burglary charges on November 17, 1998. Assistant District Attorney [hereinafter "ADA"] Scott Rogillio represented the State at the hearing. ADA Rogillio informed the court that although Ms. Tatum was not present, she wished for her victim impact statement to speak for her. (Pet. Memo Ex. 4).

At the time of his guilty plea, Petitioner was also under indictment for three additional crimes. (*See* Pet. Memo Ex. 4). He had been indicted for breaking into a school, and for the attempted sexual assault of Tasha Martin and burglary of her home. (*See id.*). At the November 20, 1998 sentencing for the burglary of the Johnson home, ADA Rogillio represented to the court that Ms. Martin did not wish to press charges against Petitioner for the burglary or attempted sexual assault charges. (*See id.*). ADA Rogillio also stated that he had spoken to Ms. Tatum, and that though she still felt Petitioner should suffer some punishment, her anger had subsided. (*See* Pet. Memo Ex. 4). After finding that the State had made no recommendation as to a sentence, and based upon the State's representation that Ms. Tatum did not want to see Petitioner incarcerated for a lengthy period of time, the judge sentenced Petitioner to seven years in the Mississippi Department of Corrections and recommended him for the Regimented Inmate Discipline Program [hereinafter "RID Program"]. (*See* Pet. Memo Ex. 4). The other charges against Petitioner were retired. (*See id.*).

Petitioner was initially held in the Lowndes County Jail and later held at the Central Mississippi Correctional Facility until he was accepted into the RID Program on January 28, 1999. (*See* Pet. Memo Ex. 51). Petitioner and Cora exchanged letters while Petitioner was incarcerated. (*See, e.g.,* Trial Tr. Vol. 16, 585-600; Trial Tr. Vol. 17, 601-643). These letters suggest that the status of the couple's relationship was uncertain, and that Cora's desire to be in a

3

romantic relationship with Petitioner vacillated. In some letters to Petitioner, Cora expressed an intense love and desire for him. In other letters, she belittled him and taunted him about her relationships with other men. In letters written shortly before Petitioner's release from the RID program, Cora wrote about wanting to marry Petitioner if he found a job that would allow him to care for her and the baby. Cora maintained at trial that she had decided that she did not want to be in a relationship with Petitioner, and that Petitioner was aware of that fact by the time he was released from the RID program. (*See, e.g.*, Trial Tr. Vol. 16, 557, 596). Cora testified that she did tell Petitioner that she would arrange for him to see the baby, Annasheika, after his release from the RID program. (*See* Trial Tr. Vol. 16, 556). She stated that on those occasions when he was to visit the child, Petitioner would ignore the baby and make sexual advances toward her. (*See id.* at 556-57).

Approximately three weeks passed between Petitioner's release from the RID program and the events of July 21, 1999. (*See* Trial Tr. Vol. 19, 942; Pet. Memo Ex. 51). On the evening prior to the murder, Cora was at home with Isaac and her boyfriend, Harold Jackson. (*See id.* at 559). The same evening, Petitioner and his friend, Anthony Betts, were visiting Reginald Martin's home, which was approximately seven houses down the street from the Johnson home. (*See id.* at 560). Cora stated that around 9:00 or 10:00 p.m. that evening, Betts called the Johnson home and asked her to bring her daughter to Reginald Martin's house to visit Petitioner. She refused to do so. (*See id.* at 559-60). Betts testified that after he got off of the phone with Cora, Petitioner called the Johnson home and spoke with Cora for approximately five minutes. (*See* Trial Tr. Vol. 17, 662). Betts also testified that the previous weekend, Petitioner told Betts that he was going to buy a gun and shoot somebody with it, but that Betts did not believe

Petitioner to be serious about doing so.  (*See id.* at 660).  Betts stated that Petitioner finished his telephone conversation with Cora, watched television, and left the Martin home around 11:00 p.m.  (*See id.* at 663-65).  At some point after Petitioner's telephone calls from the Martin home to Cora's, Harold Jackson left the Johnson home.

After leaving Martin's home, Petitioner returned to his mother's house and called Cora again around midnight.  (*See* Trial Tr. Vol. 18, 779).  Cora testified that she again refused to meet Petitioner, and that sometime around 1:00 a.m., she hung up the phone after Petitioner refused to terminate their conversation.  (*See* Trial Tr. Vol 17,  561).  According to Petitioner's confession, Petitioner then took a pistol from his mother's room and drove her gray Oldsmobile to the Johnson home, parking two houses away.  (*See* Trial Tr. Vol. 18, 808).

Michael Williams, a cousin of Isaac's, testified that he was speaking to Isaac on the telephone around 2:00 a.m., when Isaac told Michael that he heard a noise and saw a shadow move across the wall.  (*See* Trial Tr. Vol. 17, 692).  He stated that Isaac called for Cora, thinking that she was still awake, and then Isaac told him that he would call him back later.  (*See id.* at 697).

Cora testified that she remembered waking up and knowing Petitioner was in her room by the sound of his voice.  (*See* Trial Tr. Vol. 16, 563).  Petitioner was wearing black shoes, black pants and shirt, black gloves, and a beige ski mask.  (*See id.* at 563).  She stated that he had a gun in his hand, which was later identified as a .32 snubnosed revolver belonging to Petitioner's mother, Johnnie Hodges.  (*See id.* at 563; Trial Tr. Vol. 17, 736).  Cora testified that Petitioner told her to get her stuff because she was leaving with him, and when she refused, he struck her across the right side of the head with the gun.  (*See* Trial Tr. Vol. 16, 564).  Cora stated she

began gathering things for the baby, and that when Petitioner left the room, she crossed the hallway and entered her mother's dimly lit room. (*See id.*). She stated that when she saw Isaac sitting against the wall, she whispered for him to call 911. (*See id.* at 564-66). At this point, Isaac had been shot in the stomach, but Cora was unaware of that fact. Dr. Hayne testified at trial that Isaac was shot in the abdominal cavity and that death likely occurred shortly after he was shot. (*See* Trial Tr. Vol. 17, 673-79). Cora stated that Petitioner let her get milk for the baby before pulling her to Ms. Hodges' car and forcing her inside. (*See* Trial Tr. Vol. 16, 566-68). They ultimately drove to Alabama. Cora testified that Petitioner raped her in the car while holding a gun to her head. (*See id.* at 570, 577).[4] She maintained that Petitioner told her that he shot Isaac after the two had gotten into an argument, and that Petitioner told her that he had gone to the Johnson home with the intention of shooting Cora and Ms. Tatum, had she been home. (*See id.* at 578).

While Cora and the baby were with Petitioner, Ms. Hodges reported her gray Oldsmobile missing. (Trial Tr. Vol. 17, 735). Ms. Tatum, meanwhile, was attempting to phone the Johnson home to check on her children, but the line was busy. (Trial Tr. Vol. 16, 706). When Ms. Tatum went home and discovered Isaac dead and Cora and the baby missing, she ran to a neighbor's home and asked the neighbor to call 911. (*See id.* at 707). Later, investigators determined that the back door showed signs of forced entry, and a screwdriver and pair of pliers were found on a table near the back door. (*See* Trial Tr. Vol. 18, 775, 778).

Cora testified that Petitioner eventually yielded to her pleas to take the baby somewhere

---

[4] Petitioner admitted to law enforcement authorities that he and Cora had sex while in Alabama, but he contended it was consensual. (*See* Trial Tr. Vol. 16, 534).

to be cared for, and that he drove them back to Ms. Hodges' house.  (*See* Trial Tr. vol. 18, 579).

Petitioner handed the gun over to family members and turned himself into law enforcement

authorities sometime around 9:00 a.m. on July 21, 1999, approximately seven hours after the

murder.  (*See* Trial Tr. Vol. 18, 808).  Petitioner signed a written waiver of rights and gave law

enforcement officials a written confession, which was also videotaped and audiotaped.  (*See id.*

at 810).  The confession and videotape were admitted against Petitioner at trial.  (*See, e.g.,* Trial

Tr. Vol. 16, 544).  In his statement, Petitioner told law enforcement officials that he and Isaac got

into an argument, and that he shot Isaac when he thought Isaac was going to shoot him.  (*See*

Trial Tr. Vol. 18, 808).  While Petitioner was at the Sheriff's Department, Investigator Greg

Wright arrived at the Hodges' home.  (*See* Trial Tr. Vol. 17, 735).  After speaking to Cora

outside briefly, he went inside and asked Ms. Hodges for the gun, which she retrieved from

underneath a pile of blankets in a wooden house on the corner of the lot.  (*See id*. at 735-36).

Carrie Jourdan was appointed to represent Petitioner in September of 1999, and the trial

court granted her motion for Petitioner to undergo a mental evaluation.  A period of

approximately eighteen months elapsed before the Mississippi State Hospital completed its

evaluation of Petitioner.  Jourdan stated that little was done on the case in the interim.  (*See* Evid.

Hr'g Vol. II, 78).[5]  Petitioner's family grew concerned about the lack of progress in the case, and

Petitioner's mother began to search for an attorney to hire to represent her son.  She was

eventually put into contact with attorney Michael D. Miller, who was barely a year out of law

---

[5]  The Court does not imply that Jourdan's performance was substandard.  It was reasonable
for her not to pursue a serious preparation of the case  until the results of the mental examination
were completed, particularly as she thought that the results of the examination might show that
Petitioner was incompetent.  (*See* Evid. Hr'g Vol. II, 85).

school and had never tried a case in circuit court.  Miller agreed to take the case, and Petitioner

fired Jourdan and hired Miller less than a month before trial.

Petitioner was convicted of capital murder on September 13, 2001.  He was sentenced to

death for the capital murder of Isaac Johnson and to twenty years' imprisonment for the

kidnapping of Cora.  At the sentencing phase, the jury determined that Petitioner actually killed

Isaac Johnson, and that he contemplated that lethal force would be employed.  The jury found as

aggravating circumstances that (1) the murder was committed while Petitioner was engaged in

the commission of the crime of kidnapping; (2) the murder was committed while Petitioner was

engaged in the commission of the crime of burglary; (3) that the murder was committed by a

person under a sentence of imprisonment; and (4) that the capital murder was committed for the

purpose of avoiding a lawful arrest.

The instant petition was filed on February 27, 2008.  It was answered by Respondents,

and memoranda of law in support of the pleadings were filed.  This Court subsequently ordered

an evidentiary hearing on three claims relating to the sentencing phase of Petitioner's trial, and

the hearing was held on March 30, 2010 and March 31, 2010.  The parties were allowed to file

post-hearing briefs, and this case is now ripe for review.

## Applicable Standards

Because this petition is governed by the provisions of the Antiterrorism and Effective

Death Penalty Act ("AEDPA"), this Court may not grant relief in connection with any claim

adjudicated on the merits in State court proceedings unless that adjudication (1) resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

United States Supreme Court precedent; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the presented evidence.  *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (AEDPA applies to all federal habeas applications filed on or after April 24, 1996); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); 28 U.S.C. § 2254(d)(1) & (2). Additionally, the factual findings of the State court are presumed correct, and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner.  *See id.* at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005).  Whether a decision is "unreasonable" is an objective inquiry, and it does not turn on whether the decision is merely incorrect.  *See Schriro*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -  a substantially higher threshold."); *Williams,* 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable).

Additionally, a petitioner must exhaust his claim in State court, which requires him to fairly present his claim to the highest court of the State prior to seeking federal habeas relief.  *See Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004); *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001); 28 U.S.C. §2254(b)(1).  The federal claims presented for habeas relief must be the

substantial equivalent of those presented to the State court in order to satisfy the requirement of fair presentation. *See Morris*, 379 F.3d at 204-05; *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."). A federal court may not grant federal habeas relief on an unexhausted claim, but relief may be denied on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

　　Where a petitioner fails to exhaust his State remedies, but it is clear that the State court to which he would return to exhaust the claim would find the claim procedurally barred, the claim is procedurally defaulted for purposes of federal habeas corpus relief. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995). Likewise barred from federal habeas review are claims that the State court held procedurally barred on review on the basis of independent and adequate State law grounds. *See, e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests upon independent and adequate state procedural grounds."); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). In order to receive federal habeas review of procedurally defaulted claims, Petitioner must demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted).

10

In order to demonstrate cause, a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice may be demonstrated by showing that the errors "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (internal quotations omitted). If a petitioner is unable to demonstrate cause and prejudice, he may obtain review of his claim by demonstrating that the application of the procedural bar would result in a miscarriage of justice because he is actually innocent of the crime. *See House v. Bell*, 547 U.S. 518, 537-38 (2006). An allegation of actual innocence requires that a petitioner support his claim "with new, reliable evidence that was not presented at trial and show that it was more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman v. Anderson*, 188 F.3d 635, 655 (5th Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). In terms of the sentencing phase of a capital murder trial, "miscarriage of justice" also means that, but for constitutional error, no reasonable juror would have found Petitioner eligible for the death penalty under the applicable state law. *Sawyer v. Whitley*, 505 U.S. 335, 336 (1992). Moreover, where a State court holds a claim barred on independent and adequate State law grounds and reaches the merits of the claim in the alternative, the bar imposed by the State court is not vitiated. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar imposed for petitioner's failure to contemporaneously object and preserve claim for review not circumvented by State court's alternative holding that constitutional claim lacked merit).

With the foregoing standards in mind, the Court turns to Petitioner's specific claims for relief.

## I. Improper Removal of Juror for Cause

Petitioner argues that although potential juror James Thomas was excused from jury services based upon the belief that his views on the death penalty prevented him from performing his duty under the law, that finding is not supported by the trial record. On direct appeal, the Mississippi Supreme Court rejected this claim of error, finding that the potential juror's equivocal stance on the death penalty permitted the trial court to strike him for cause. *See Hodges I*, 912 So.2d at 777-78. Petitioner maintains that Mr. Thomas was removed based on his general objection to the death penalty, and that he did not equivocate in his responses, thereby rendering the State court's decision unreasonable.

Mr. Thomas participated in an individual voir dire upon the State's request based upon answers given on his juror questionnaire. (*See* Trial Tr. Vol. 14, 260). Mr. Thomas stated on his juror questionnaire that he mildly agreed with the death penalty, but that he could not vote to impose it. (*See* Trial Tr. Vol. 15, 425). During voir dire, he stated that he was "[n]ot totally" in favor of the death penalty, as whether it should be imposed depended upon "the crime and the person's intent." (*See id.* at 425). Mr. Thomas stated that he might be in favor of the death penalty if the murderer did not show remorse for the crime, but that he was "conscious" against it. (*See id.*). Mr. Thomas explained that "[i]f a person commit a crime and didn't show no remorse and no reason for doing it, I may be in favor of it; but most cases I'm not for it, you know, because it don't prove that a person do it and you're asking a person's life that may be innocent." (*See id.* at 426). He explained that he had a moral opposition to the death penalty, but that he "would pray about it" and "probably would" impose the death penalty if the facts were bad enough. (*See id.* at 426-27). When District Attorney [hereinafter "DA"] Allgood asked

12

whether he would favor the life options over the death option if he knew that he always had the option of returning a sentence of life imprisonment, Mr. Thomas stated he could not really be fair because he would begin deliberations favoring one side. (*See id.* at 427-28). Upon defense counsel's voir dire, Mr. Thomas stated that he guessed he could consider the death penalty as an option once he heard the evidence. (*See id.* at 429). After hearing arguments from counsel, the trial court found that "the equivocating views expressed by this juror would prevent and substantially impair the performance of his duties as a juror in accordance with the instructions and his oath." (*See id.* at 430).

The United States Supreme Court has held that a defendant's right to a trial by an impartial jury is infringed when the State excuses for cause members of the venire who merely express conscientious objections to the death penalty. *See Witherspoon v. Illinois*, 391 U.S. 510 (1968). In *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the Court gave the proper standard for determining when the State could exclude for cause a juror based on his views on capital punishment. The Court stated the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Petitioner argues that without an irrevocable commitment to vote against the death penalty regardless of the facts or circumstances of the case, a juror may not be struck for cause. However, the Supreme Court has held that a potential juror's bias need not be established unequivocally to support a strike for cause, as the demeanor of the juror may be the means by which the court determines the presence of bias in the face of ambiguous or shifting answers. *See id.* at 424-26. The determination made by a trial court as to a potential juror's ability to

13

follow the law and his oath is entitled to deference on habeas review. *See id.* at 427-30; *Uttecht v. Brown*, 551 U.S. 1, 6-7 (2007). Moreover, the Court has determined that ambiguity in the juror's statements may be resolved in the State's favor. *See Witt*, 469 U.S. at 434; *Uttecht*, 551 U.S. at 7. Petitioner has not demonstrated that the decision of the Mississippi Supreme Court is unreasonable within the meaning of the AEDPA, and this claim is dismissed.

## II. Prior "Bad Act" Testimony

Petitioner maintains that his trial was rendered fundamentally unfair when the prosecution elicited from Cora Johnson that Petitioner had broken into her home prior to the night Isaac was shot, and that he had raped her during the period of time he was holding her against her will. The trial court denied Petitioner's motion for a mistrial, and the court failed to give a limiting instruction with respect to Cora's testimony. Petitioner maintains that Cora's uncorroborated testimony was only relevant for the improper purpose of proving Petitioner's propensity to commit serious crimes. He also argues that there is no evidence that Isaac was murdered so that Petitioner could sexually assault Cora, and that the alleged assault was independent from the charged offenses. Petitioner also contends that as the charges against him were elevated to capital murder based upon his burglary of the Johnson home with the intent to commit assault, the testimony concerning the alleged prior acts was not harmless error.

On direct appeal, the Mississippi Supreme Court determined that Cora's fleeting reference to Petitioner's prior burglaries of the Johnson home did not constitute reversible error. *See Hodges I*, 912 So.2d at 778-79. The court noted that the testimony was not elicited by the prosecution, and that Cora only once mentioned Petitioner's incarceration that resulted from the prior burglary of the home. *See id.* at 779. The court also rejected Petitioner's claim that it was

14

error for the trial court to fail to provide the jury with a limiting instruction. *See id.* Citing prior case law holding that the trial court has no obligation to *sua sponte* issue a limiting instruction where none has been requested by defense counsel, the court found the record did not contain a request from counsel that one be provided and rejected the claim. *See id.*

The court also considered whether the trial court erred in allowing the introduction of evidence that Petitioner raped Cora during the time she was kidnapped. *See id.* at 779-780. The court found the record clearly showed that the trial judge conducted a balancing test and determined that the probative value of the evidence outweighed its prejudicial effect. *See id.* at 780. The court determined that while evidence of prior uncharged offenses is generally not admissible at trial, it found Cora's rape to be "integrally related in time, place and fact with the murder of Isaac Johnson." *See id.* at 780-81. It also found that the rape was "integrally intertwined" with the kidnapping of Cora. *See id.* at 781.

At trial, then seventeen year old Cora Johnson was the first witness to testify during the State's case-in-chief. (*See, e.g.,* Trial Tr. Vol. 16, 551). After asking Cora some foundation questions, the prosecutor asked Cora to tell the jury "what happened in the course" of her relationship with Petitioner. (*See id.* at 554). In response, Cora stated:

> Well, I met Quintez in the summer of '97. At first it was going fine until about four months into our relationship he started sneaking into my mother's house. I knew, but my mother didn't know. When he started getting caught and my mother used to call the police. I used to tell him to stop, and if he didn't stop, that I was going to cancel our relationship. About the sixth month of our relationship, he broke in and me and my mother found him underneath my bed, and he got locked up for a year and a half. (Trial Tr. Vol. 16, 554).

Defense counsel Rogers objected on the ground that Petitioner was not on trial for that crime and moved for a mistrial on the ground that the testimony was highly prejudicial. (*See id.*). When

15

the prosecutor requested that he be allowed to lead the witness, the court granted the request and took defense counsel's objection and motion under advisement. (*See id.* at 555). The prosecution asked Cora a series of questions to elicit testimony that a child was born out of the intimate relationship that existed between Cora and Petitioner, and to establish that the relationship ended in January 1998. (*See id.*). The court then denied the motion for a mistrial. (*See id.* at 555-56). Cora stated that she initiated the breakup because Petitioner would not stop breaking into her house even though she told him the relationship would end if he continued. (*See id.* at 556). Cora then recounted the events on the night of the murder. (*See id.* at 556-570). While testifying as to the events that transpired while Petitioner was driving through Alabama, Cora stated that Petitioner stopped the car on a rock road. (*See id.* at 570). At that point, the trial judge asked the attorneys to approach the bench and asked whether there was not a pending motion as to the testimony Cora was preparing to give. (*See id.* at 570-71). When the prosecutor noted that the testimony would be about the sexual intercourse that occurred, defense counsel Rogers objected on the ground that it was not a charged act. (*See id.* at 571). The trial judge heard arguments on the issue outside of the jury's presence. (*See id.* at 571-72). The State argued that it intended to elicit from Cora that Petitioner forced her to engage in sexual acts, and that the purpose of the testimony was to show the jury his purpose for going into the house that night. (*See id.* at 572). The prosecutor argued that Petitioner's obsession with Cora and his intent was the "crux of the State's theory." (*See id.*). Defense counsel Rogers stated that the intent laid out in the indictment was burglary with the intent to commit an assault, and that Petitioner was not charged with burglary in order to have sexual intercourse with Cora. (*See id.* at 572-73). The prosecutor argued that the testimony would serve to complete the picture for the

16

jury and that it "underlines this defendant's obsession with this particular victim."  (*See id.* at 574).  The court found the evidence part of a continuous event that was admissible to show intent and to give the jury the complete picture of what happened.  (*See id.* at 575).  The court also conducted a balancing test and found the evidence's probative value outweighed the risk of unfair prejudice.  (*See id.*).  When the jury was brought back in, Cora testified that Petitioner forced her to have sex in the backseat of the car while holding a gun to her head.  (*See id.* at 577).

Cora was then cross-examined by defense counsel Miller, who repeatedly asked pointed questions about Petitioner's prior acts of breaking into the Johnson home and his subsequent incarceration.  (*See, e.g.,* Trial Tr. Vol. 16, 585; *see also* Trial Tr. Vol. 15, 596; Trial Tr. Vol. 16, 602,607-08, 612, 613, 615, 617, 618, 622, 635, 636, 637, 640, 642, 643, 644, 649).  Defense counsel also questioned Cora extensively about letters she had written to Petitioner while he was incarcerated.  Through this questioning, defense counsel attempted to demonstrate to the jury that Cora constantly vacillated between declarations of love for Petitioner and taunts to Petitioner about other men, and that she expressed a desire to see Petitioner when he was released from jail.  (*See id.*).

The evidentiary ruling of a state court does not provide a basis for federal habeas relief unless  it violates a specific constitutional right or is "so egregious that it renders the petitioner's trial fundamentally unfair."  *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005).  The Fifth Circuit has held that uncharged offenses may be admitted into evidence without offending due process where the government demonstrates (1) a strong showing that the defendant committed the offense, and (2) the extraneous offense is rationally connected with the offense charged.  *Story v. Collins*, 920 F.2d 1247, 1254 (5th Cir. 1991) (quotations omitted).  Even if the Court

determines that the admission of the evidence is an error of constitutional dimension, it must find the testimony had a "substantial and injurious effect or influence in determining the jury's verdict" before habeas relief may be granted.  *See Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (citations omitted).

First, the Court rejects Petitioner's claim that the Mississippi Supreme Court reached an unreasonable determination of facts in light of the record evidence.  The Mississippi Supreme Court  specifically stated that Petitioner's jail time was not mentioned during the prosecution's direct examination of Cora after she first stated that he had served jail time for breaking into her home.  *See Hodges I*, 912 So.2d at 779.  Cora did mention Petitioner breaking into the Johnson home on one other occasion during direct examination, but her answer did not reference Petitioner's incarceration and was not elicited by the State.  (*See* Trial Tr. Vol. 16, 556).  The repeated references to Petitioner's incarceration came during defense counsel's cross-examination of Cora, where counsel attempted to discredit her testimony that she wanted nothing to do with Petitioner.  (*See, e.g.,* Trial Tr. Vol. 16, 587-90).  Even if this Court were to assume that Petitioner has demonstrated error, it is not likely that the jury would have found Petitioner not guilty had the statements about Petitioner's incarceration been excluded.  *See Bigby v. Dretke*, 402 F.3d 551, 564 (5th Cir. 2005) (court rejecting due process claim because petitioner could not establish that the evidence had an injurious effect on the jury's verdict at the guilt/innocence stage of trial).

The Court also finds that the Mississippi Supreme Court's application of law to Petitioner's claim regarding the sexual assault evidence was not unreasonable.  Such evidence, while generally inadmissible, is admissible "where the offense charged and that offered to be

18

proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences." *See Neal v. State*, 451 So.2d 743, 758 (Miss. 1984), *see also* Miss. R. Evid. 404(b). In this case, Cora testified that the rape occurred while she was being held against her will after Isaac was shot. The court found it to be relevant to the telling of a cohesive story and intertwined with the murder and kidnapping itself. As Mississippi law allows the uncorroborated testimony of a sex crime victim to be sufficient to support a sex crime conviction where it is not contradicted by credible evidence, the Court finds no reason to assume it would require it to be corroborated to form part of the *res gestae* of the events occurring during a murder and kidnapping. *See, e.g., Cross v. State*, 759 So.2d 354, 356 (Miss. 1999); *Goss v. State*, 465 So.2d 1079, 1082 (Miss. 1985); *Otis v. State*, 418 So.2d 65, 66 (Miss. 1982).

Petitioner has not demonstrated that under these facts it was unreasonable for the Mississippi Supreme Court to conclude that the denial of a limiting instruction and/or motion for a mistrial deprived him of his due process rights. The day after Isaac's murder, Petitioner turned himself into police, voluntarily gave a statement to authorities admitting that he shot Isaac, and his family members turned over the weapon that had been in his possession that was conclusively linked to Isaac's murder. Cora testified that Petitioner arrived at her home wearing a ski mask and black clothing, and that she was forced at gunpoint to go with him. The overwhelming evidence of Petitioner's guilt precludes a finding that the admission of this evidence, even if error, was a crucial, critical, and highly significant factor in his trial. *See Givens v. Cockrell*, 265 F.3d 306, 308 (5th Cir. 2001). Petitioner is denied habeas relief on this claim.

### III. The State's Introduction of False Testimony

In May of 1998, Ms. Tatum brought charges against Petitioner for the burglary of her

19

home after she and Cora arrived home to find him hiding under Cora's bed.   He was indicted for burglary of a dwelling and pled guilty to the charge in November 1998.  (Pet. Memo Ex. 4). Petitioner was sentenced to seven years imprisonment in the Mississippi Department of Corrections and recommended for the RID program.  (*See id.*).   He served approximately six months in the RID program and was released in June of 1999, three weeks before Isaac Johnson's murder.

At his capital murder trial, both Petitioner and his mother, Johnnie Pearl Hodges, testified at the sentencing phase.  Each was asked on cross-examination about his or her knowledge of Ms. Tatum's intercessions to the court to keep Petitioner out of the penitentiary on the 1998 burglary charge.  Each denied knowledge of any such pleas on Petitioner's behalf.  (*See, e.g.*, Trial Tr. Vol. 19, 977-1017).  The State called ADA James Thomas Kitchens, Jr., to rebut the testimony given by Petitioner and his mother.[6]  ADA Kitchens testified that, although the State was seeking a fifteen year term of imprisonment, Ms. Tatum told him that she did not want Petitioner sentenced to the penitentiary.  (*See id.* at 1026-27).  In closing argument, the prosecutor argued that Petitioner had already been given "a huge measure of grace" . . . "whether he wants to acknowledge it or not" because of Ms. Tatum's intercession, and that he killed her son "after being given a second chance of monumental proportions." (Trial Tr. Vol. 20, 1077).

The transcript of the 1998 burglary plea was ordered by Petitioner's counsel on direct appeal of his capital murder conviction, and it shows that the prosecution made no recommendation on Petitioner's sentence.  (Pet. Memo Ex. 4).  It also shows that Ms. Tatum never requested on the record that Petitioner receive probation or admittance into the RID

---

[6]  James Kitchens, Jr., is now a circuit judge in the 16th judicial district in Mississippi.

program.  (*See id.*).  There is no mention in the transcript of ADA Kitchens' participation in the

burglary plea.  (*See id.*).  Petitioner maintains that the prosecution presented false evidence at the

sentencing phase of Petitioner's trial and cross-examined witnesses without a good-faith basis,

thereby depriving him of a fair trial.  This error was compounded, he argues, when the

prosecution seized upon it in closing argument.

On direct appeal, the Mississippi Supreme Court refused to consider the transcript of the

prior plea hearing in evaluating Petitioner's claim of prosecutorial misconduct, as the transcript

was not part of the trial court record.  *See Hodges I*, 912 So.2d at 749-50.  The court noted it

denied Petitioner's motion to expand the record to include the information, and that

consideration of the evidence was barred.  *See id.*  The court cited newly-amended Rule 22 of the

Mississippi Rules of Appellate Procedure, which clarified that petitioners could only bring on

direct appeal those issues based upon facts fully apparent from the record.  *See id.*[7]  The court

also noted that no objections were made during the cross-examination of Petitioner or his mother,

and that the issue was barred for that reason, as well.  *See id.*  The court noted that because it was

a capital case, however, the claim would be considered without consideration of the extraneous

evidence.  *See id.* at 751.  The court found that through ADA Kitchens' testimony, the "state

produced the testimony that proved there was an evidentiary basis for the questions elicited

during the cross of Ms. Hodges and the defendant."  *See id.*

The court also held Petitioner could not prevail on his claim that the State knowingly

---

[7]  Rule 22(b) was amended effective February 10, 2005, shortly before the opinion on direct
appeal was issued, to provide that "[i]ssues which may be raised in post-conviction proceedings may
also be raised on direct appeal **if such issues are based on facts fully apparent from the record**."
Miss. R. App. P. 22(b) (amended text bold).  The court did note that the newly-amended rule was
inapplicable to Petitioner's claim.  *See Hodges I*, 912 So.2d at 750.

used false evidence that deprived Petitioner of a fair trial, and Petitioner failed to prove the prosecutor knew or believed that the material testimony he was presenting was false. *See id.* at 751. The court found that Petitioner "has not offered any proof that Kitchens' testimony was false, that it was material to the verdict or that the State knew that it was false. Hodges, in his brief, claims that it is false but offers nothing to support this claim nor were there any objections to this testimony during the sentencing phase." *See id.* On post-conviction review, the court noted Petitioner raised the claim with the transcript of the prior plea hearing attached. *See Hodges II*, 949 So.2d at 713. The court found the issue barred by res judicata. *See id.*

Respondents argue that the evidence necessary to demonstrate the falsity of the testimony - the plea hearing transcript - was available to trial counsel and known to be relevant to the capital murder trial, and that the claim is barred. However, Petitioner's trial counsel would have had no reason to believe that they would need an actual transcript of Petitioner's prior burglary plea at the capital murder trial in order to correct the State's presentation of false testimony. To the extent cause and prejudice are required to overcome the determination that this claim is barred for counsel's failure to contemporaneously object, Petitioner has established same. *See, e.g., Coleman*, 501 U.S. at 750. Moreover, the failure to consider the plea transcript on direct appeal and then determining the issue res judicata on post-conviction review is a Catch-22 that has improperly denied Petitioner a fair opportunity to present his claim. *See Michel v. Louisiana*, 350 U.S. 91, 93-95 (1955) (test of due process with State procedural rule is whether defendant has had "a reasonable opportunity to have the issue as to the claimed right heard and determined by the State court"). Therefore, the Court will consider the prior plea transcript in assessing Petitioner's claim.

Petitioner entered a plea of guilty to a charge of burglary of a dwelling on November 17, 1998, before Judge Lee J. Howard in the Circuit Court of Lowndes County, Mississippi. (*See* Pet. Memo Ex. 4). William Bambach appeared as attorney for Petitioner, and the State was represented by ADA Scott Rogillio. (*See id.*). The indictment charged that Petitioner broke into Ms. Tatum's home on May 25, 1998, with the intent to steal. (*See id.*). After accepting the plea, the court inquired whether the State had a recommendation as to the sentence to be imposed. (*See id.*). ADA Rogillio stated the plea was open, but that the State had agreed to retire two other indictments against Petitioner as part of the plea bargain. (*See id.*). Both the defense and the State informed the court that they wished to put on witnesses, and the judge set the matter for sentencing on November 20, 1998, to allow the parties time to collect their evidence in aggravation and mitigation. (*See id.*).

On November 20, 1998, ADA Rogillio stated he had spoken with Ms. Tatum the previous day, and that she had stated she wanted the court to consider her victim impact statement to speak for her. (*See id.* at 10). The victim impact statement, dated August 13, 1998, indicates that Ms. Tatum is fearful of Petitioner and, though she does not know what punishment he should receive, she wants him out of her family's life and where he cannot do "this" to anyone else. (*See* Pet. Memo Ex. 5). ADA Rogillio also stated at the sentencing hearing that Ms. Tatum believed Petitioner should be punished, but her "anger towards him ha[d] somewhat subsided." (Pet. Memo Ex. 4 at 11). Mr. Bambach informed the court that he had received word that Ms. Tatum had recently discovered her daughter was conducting a "one-sided letter campaign" to Petitioner while he was in jail. (*See id.*). Mr. Bambach requested that Petitioner be placed in the RID program, and Petitioner was called to testify to the events that took place on May 25, 1998.

(*See id.* at 12). The court found that while the State made no recommendations as to Petitioner's sentence, it "made the Court aware of the fact that the victim is not that hostile or eager to see this defendant incarcerated for a long period of time." (*See id.* at 16-17). The court sentenced Petitioner to seven years in the Mississippi Department of Corrections and recommended him for the RID program. (*See id.*).

During the cross-examination of Ms. Hodges at the sentencing phase of Petitioner's capital murder trial, DA Allgood questioned her about whether Ms. Tatum told Petitioner's defense attorney in the proceedings relating to the prior burglary charge that Ms. Tatum did not want Petitioner to go to prison. (*See* Trial Tr. Vol. 19, 977). Ms. Hodges testified that she had no knowledge of Ms. Tatum requesting that Petitioner not be sentenced to prison, and that she only remembered that the prosecutor told the judge that Ms. Tatum wanted Petitioner to serve seven years in jail. (*See id.* at 984). Ms. Hodges also denied that she knew that ADA Kitchens recommended a sentence of fifteen years' imprisonment for the crime. (*See id.* at 985-87). During the cross-examination of Petitioner, DA Allgood asked Petitioner similar questions regarding Ms. Tatum's alleged requests to the court, and Petitioner also denied knowledge of Ms. Tatum's request and the State's recommended sentence. (*See id.* at 1016-17). ADA Kitchens was called in rebuttal to the testimony given by Petitioner and his mother. (*See id.* at 1025). He stated that he had met with Petitioner's attorney on the prior burglary charge, and that the defense attorney informed him that Ms. Tatum did not want Petitioner to go to prison. (*See id.* at 1026-27). ADA Kitchens testified that he then spoke to Ms. Tatum, and she confirmed that those were her wishes. (*See id.* at 1027). He testified that Petitioner put on witnesses to ask for a more lenient sentence, and that the State requested a sentence of fifteen years. (*See id.*). ADA

Kitchens testified that at the conclusion of the sentencing hearing, Petitioner's attorney informed the court that Ms. Tatum did not wish for Petitioner to go to prison because he was to be the father of her grandchild, and that ADA Kitchens confirmed that to the court. (*See id.*).

During Petitioner's post-conviction proceedings, ADA Kitchens submitted an affidavit that states that DA Allgood asked him to handle Petitioner's plea, and that he had recommended a sentence of fifteen years to the court on the 1998 house burglary. (*See* Pet. Memo Ex. 6, Aff. of James T. Kitchens, Jr., March 28, 2006). ADA Kitchens states he spoke to Ms. Tatum before Petitioner's guilty plea, and that she indicated she did not want Petitioner to go to prison. (*See id.*). He states that the information was relayed to the court in chambers, and that his testimony at the sentencing hearing in September 2001 was based on his mistaken belief that he had actually conducted the plea colloquy. (*See id.*). He states, however, that he was present in the courtroom and chambers throughout the whole process. (*See id.*). Scott Rogillio also submitted an affidavit stating that he was the ADA who participated in the case, and that Ms. Tatum, contrary to their desires, did not want Petitioner to be incarcerated. (*See* Pet. Memo Ex. 7, Statement of Scott Rogillio, March 23, 2006). He states ADA Kitchens was with him at the table even though he was the one who spoke on the record during the plea. (*See id.*).

The Due Process clause of the Fourteenth Amendment prohibits the government from knowingly using, or failing to correct, false testimony. *Giglio v. United States*, 405 U.S. 150, 153 (1972). In order to prove a violation, Petitioner must establish that (1) false testimony was given; (2) the government knew it to be false; and (3) the testimony was material. *See United States v. Gonzalez*, 436 F.3d 560, 580 (5th Cir. 2006). Evidence is "material" if there exists "any reasonable likelihood [that the false evidence could] have affected the judgment of the jury."

25

*Naupe v. Illinois*, 360 U.S. 264, 269 (1959).  Essentially, the test for materiality is  the equivalent of the harmless-error standard, which requires "the beneficiary of a constitutional error [to] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *Chapman v. California*, 386 U.S. 18, 24 (1967).  This Court must "make a judgment about the significance of the presumption [created by the false evidence] to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption."  *Yates v. Evatt*, 500 U.S. 391, 404 (1991), *overruled on other grounds by*, *Estelle v. McGuire*, 502 U.S. 62 (1991).

This issue was addressed at the evidentiary hearing held by this Court.  At the evidentiary hearing, DA Allgood said that he asked then ADA Kitchens to handle the plea and get a sentence of no less than fifteen years against Petitioner.  (Evid. Hr'g Tr. Vol. I at 33-34).  He testified that he spoke to ADA Kitchens about the prior burglary plea before the sentencing phase of the capital murder trial began because he thought ADA Kitchens might need to be a witness.  (*See id.* at 35).  At the hearing held in this Court, Judge Kitchens and DA Allgood both stated that the "substance" of the statements testified to at the capital murder trial were true, but that there was a mistake as to who performed the allocution and what was on the record.  (*See, e.g., id.* at 36, 40-41).  Specifically, Judge Kitchens testified before this Court that he was present at the 1998 burglary charge plea hearing and that, while it is not on the record, the State was seeking a term of imprisonment of fifteen years on the charge.  (*See id.* at 49, 59-60).  He also testified that Ms. Tatum stated that she did not want Petitioner to go to prison, and that her wishes were relayed to the judge.  (*See id.* at 49-60).

The testimony of Mr. Kitchens at Petitioner's trial and in this Court is factually at odds

with what is contained in the record, and DA Allgood should have known that the testimony given by ADA Kitchens was false. *See* Giglio, 405 U.S. at 154 (prosecutor's office is single entity; knowledge of one ADA is attributable to others in the same office). The Court notes that the first statement made by the court that sentenced Petitioner on the prior burglary plea is that "[t]he State has made no recommendation as to a sentence. . ." (Evid. Hr'g Ex. 4, 16). Also, there is no indication anywhere in the record that Petitioner's attorney, Mr. Bambach, ever spoke to Ms. Tatum in person or that she expressed to him a desire that Petitioner not go to prison. (*See* Pet. Memo Ex. 4, 10-12). Moreover, ADA Kitchens, having been given notice that he would likely give testimony about this prior plea at the sentencing phase of a capital murder trial, apparently took no measures to ensure that he had an accurate recollection of what transpired. (*See* Evid. Hr'g Tr. Vol. I, 32; 52; 65). Even if Ms. Tatum stated that she did not want Petitioner to go to the penitentiary, that statement was never made in open court. Therefore, even if it occurred, it occurred off of the record and outside of Petitioner and his mother's presence.

The Court determines that the State court reached a decision based upon an unreasonable determination of facts and involving an unreasonable application of clearly established federal law. Petitioner presented the State court with evidence to demonstrate that the testimony given at his capital murder trial was false, and that the prosecution should have known it was false. He has also shown that there exists a reasonable likelihood that the jury's verdict might have been affected as a result of the false testimony. *See, e.g., Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998). In this instance, the State, seemingly unconcerned with the accuracy of the testimony to be given in a trial where the result could be death, provided the jury with false information. That information was elicited to show that Petitioner is a remorseless liar who was shown kindness

that he refused to acknowledge and which he repaid by murdering the son of the woman who extended it. In light of these facts, this Court concludes that there exists a reasonable probability that this testimony affected the jury's judgment. *See Giglio*, 405 U.S. at 153-55. Confidence in the verdict has been undermined by the State's actions, there has been no demonstration that the error did not contribute to Petitioner's death sentence, and Petitioner is entitled to relief on this claim.

### III.  Failure to Properly Instruct on Parole

At the sentencing phase of trial, Petitioner's jury was instructed that it had the options of sentencing Petitioner to (1) life with parole; (2) life without parole; and (3) death. The jury was also instructed that if it could not reach a decision, the trial court would sentence Petitioner to life with the possibility of parole. Petitioner maintains that he was not eligible for a sentence of life with the possibility of parole at the time of his sentencing, and the prosecutor exacerbated that prejudicial misinformation by referencing parole in his closing argument. Thus, he maintains, it was contrary to and an unreasonable application of clearly established law for the Mississippi Supreme Court to find the error harmless.

On direct appeal, the Mississippi Supreme Court found Petitioner's claim procedurally barred due to counsel's failure to object to the verdict form. *See Hodges I*, 912 So.2d at 770. Notwithstanding the bar, the court engaged in a discussion of the merits and found the claim of error lacking in merit. First, the court found that as Petitioner was not an habitual offender, the court was not required to instruct the jury that "life" meant life without parole. *Id.* (citing *Smith v. State*, 724 So.2d 280, 295 (Miss. 1998)). Second, the court noted that consideration of the "quantum of punishment" serves to "subvert a proper determination of the sentencing issue" and

28

"invit[es] the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority," thereby introducing arbitrariness into the sentencing proceedings. *Id.* (citing *Williams v. State*, 445 So.2d 798, 813 (Miss. 1984)). Finally, the court noted that the verdict form constituted error, and that it was error for the State to comment during closing argument on what the court would do if the jury did not reach an agreement. *See id.* at 771. The court determined, however, that the errors alone were not reversible because they did not deny Petitioner a fair sentencing hearing. *See id.* at 771. The court also noted that "the trial court strictly followed the language of the statutes and the jury was instructed in the verdict form" in accordance with the statutes. *Id.* at 771. The court acknowledged that the possibility of parole for someone convicted of capital murder has been "effectively eliminated" by statute, but that no prejudicial error resulted as the jury, knowing it could return a sentence of life without parole, chose death. *Id.* at 772. On post-conviction review, the court cited its direct appeal merits discussion of the issue and held the claim barred by res judicata. *Hodges II*, 920 So.2d at 722-23.

Where the decision of the State court rests upon a clearly expressed independent and adequate state law ground, federal habeas review of the claim is barred absent a showing of cause and prejudice. *See, e.g., Coleman*, 501 U.S. at 750; *see also Stokes v. Anderson*, 123 F.3d 858, 860-61 (5th Cir. 1997) (finding Mississippi's contemporaneous objection requirement an independent and adequate procedural bar). Contrary to Petitioner's assertion, the alternative discussion of the merits of Petitioner's claim in the court's direct appeal decision does not vitiate the bar imposed by the Mississippi Supreme Court. *See Harris v. Reed*, 489 U.S. 255 (1989), *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998) ("It is clear in this Circuit that alternative

rulings do not operate to vitiate the validity of a procedural bar that constitutes the primary holding.").[8]  However, on post-conviction review, the Mississippi Supreme Court did not rely upon its prior finding of procedural default to dismiss the claim.  Instead, it found the claim barred on res judicata grounds after citing its previous merits discussion.  Therefore, the Court is not prevented from reviewing the claim.  *See Harris*, 489 U.S. at 262 ("[A] federal claimant's procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default.").  Because the Mississippi Supreme Court held the issue barred by res judicata while citing its merits discussion and not its previous finding of default, there is no bar to federal habeas review.  *See Cone v. Bell*, 556 U.S. ___, ___, 129 S.Ct. 1769, 1780-82 (2009).

Petitioner also maintains that the Mississippi Supreme Court failed to address his claim that the trial court's instructions, coupled with the State's arguments regarding Petitioner's future dangerousness, required that the jury be informed Petitioner was not eligible for parole under the rule set forth in *Simmons v. South Carolina*, 512 U.S. 154 (1994).  Respondents argue that Petitioner's argument concerning the necessity of a *Simmons* instruction was never argued within the context of erroneous jury instructions at the State level, and that it is likewise procedurally barred in this Court because it cannot now be raised in State collateral proceedings.  The Court rejects Respondents' claim that Petitioner did not present his claim to the State court and that it is barred from review on that basis.  In his brief on direct appeal to the Mississippi Supreme Court, Petitioner cited *Simmons* in support of his argument that it is a requirement that the jury be

---

[8]  Petitioner also argues that counsel's ineffectiveness constitutes cause for the defaulted claim, but he did not fairly present an ineffective assistance of counsel claim on this ground to the State court.  Therefore, it cannot be considered as cause to excuse the default.  *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

instructed that a defendant will be ineligible for parole in cases where a possibility of parole does not exist. (Briefs Vol., 57-58). The Court also notes, however, that the Mississippi Supreme Court was not required to cite or discuss *Simmons* in its decision. The Fifth Circuit has consistently held that the AEDPA requires this Court to review the State court's decision and not its reasoning. *See, e.g., Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001). The Court will consider the merits of Petitioner's claim.

Mississippi's statutes governing the sentencing options for a defendant convicted of capital murder provide for three sentencing options: death, life without the possibility of parole, and life with the possibility of parole. *See* Miss. Code Ann. § 99-19-101. The statutes provide that the trial judge will "impose a sentence of imprisonment for life" if the jury cannot reach a decision. *See* Miss. Code Ann. § 99-19-103. The parole statues, however, eliminate the possibility of parole for someone convicted of capital murder. *See, e.g.,* Miss. Code Ann. § 47-7-3(1)(f) ("No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101."). The Mississippi Supreme Court's interpretation of the statutes in the collective is that a defendant who is convicted of capital murder may only be sentenced to death or life imprisonment without the possibility of parole. *See Rubenstein v. State*, 941 So.2d 735 (Miss. 2006); *Flowers v. State*, 842 So.2d 531, 557 (Miss. 2006) ("[A] defendant on trial for capital murder may only be sentenced to death or life imprisonment without the eligibility for parole."); *Branch v. State*, 882 So.2d 36, 79 (Miss. 2004); *Pham v. State*, 716 So.2d 1100, 1103 (Miss. 1998) ("[I]n reality there is really only a choice between death and life without parole" for a sentencing jury in a capital murder case.); Miss Code Ann. § 47-7-3(1)(f); Miss. Code Ann. § 47-5-139(1)(a) (mandating that an inmate

sentenced to life for capital murder "shall not be eligible for the earned time allowance").

Where a criminal defendant is ineligible for parole, the jury should be instructed as to that fact prior to deliberating in the sentencing phase of a capital murder trial. *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994). This rule "applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000). In this case, Petitioner was ineligible for parole as a matter of State law. As such, he was entitled to have the jury correctly instructed that he would be ineligible for parole if sentenced to life imprisonment. *See Richmond v. Polk*, 375 F.3d 309, 316 (4th Cir. 2004) (holding that defendants "have the opportunity to inform the jury of their parole ineligibility irrespective of how it came about"); s*ee also Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998) ("[T]he Fifth Circuit has repeatedly refused to extend the rule in *Simmons* beyond those situations in which a capital murder defendant is statutorily ineligible for parole."). Petitioner's jury chose death knowing that they could choose to sentence him to life imprisonment without the possibility of parole, and the Mississippi Supreme Court's recitation of that fact is accurate. The consequence it attaches to that fact, however, is unreasonable. The Mississippi Supreme Court relied upon *Puckett v. State*, 737 So.2d 322, 362 (Miss. 1999), as containing the law relevant to Petitioner's claim. *See Hodges I*, 912 So.2d at 772; *Hodges II*, 949 So.2d at 722. In that case, however, Puckett was sentenced to death after the jury was instructed that the sentencing options were death and life without the possibility of parole. *See Puckett*, 737 So.2d at 362. Puckett argued that since the statutes provided for three sentencing options, all three should have been given in his case. *See id.* The court found that, as the option of parole had been eliminated for a defendant convicted of capital murder, the trial

court's failure to include a life with the possibility of parole option in its instructions was not

harmful error. *See id.* In Petitioner's case, however, the trial court not only gave a false choice

to the jury by including the "life with" option, it additionally injected parole considerations by

inaccurately instructing the jury what would happen if they failed to reach a verdict. The

Mississippi Supreme Court did not acknowledge, and this Court cannot neglect, the reality that

the jury's inability to agree upon a verdict was a fourth sentencing option. In this case, the jury

was instructed that "[i]f you are unable to agree upon a sentence, then the Court must sentence

the Defendant to a term of life imprisonment with the possibility of parole." (SCP Vol. 11, 1549-

1550).[9] This Court cannot know whether at least one juror, despite a desire to vote for a sentence

of life imprisonment without parole, voted to impose a sentence of death to prevent a hung jury,

and thus, Petitioner's potential release into society.

The form of the verdict in this case denied Petitioner due process and a reliable

sentencing hearing, particularly given the prosecution's comments on the subject of parole during

closing argument. The jury was given a choice that did not reflect the realities of the sentencing

options and precluded a jury decision based on an understanding of those realities. *See Simmons*,

512 U.S. at 161 (inaccurate sentencing information gives jurors impermissible "false choice");

*see also Shafer v. South Carolina*, 532 U.S. 36, 53-54 (2001) ("Without the knowledge that. . . a

life sentence is not subject to being reduced by parole, or any other method of early release, the

---

[9] Additionally, the statute governing what happens in the event that the jury cannot agree upon punishment does not include any parole language. *See* Miss. Code Ann. § 99-19-103 (statute reading, in part, that "[i]f the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life."). By inserting parole language, the trial court did not "strictly follow[] the language of the statutes." *Hodges I*, 912 So.2d at 771.

jury is likely to speculate unnecessarily on the possibility of early release, and impose a sentence of death based upon 'fear rather than reason.'") (citation omitted). As the United States Supreme Court has held that accurate sentencing information is "an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," the Court does not find the error harmless. *Gregg v. Georgia*, 428 U.S. 153, 190 (1976); *see also O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (where federal judge in habeas proceeding is in grave doubt about whether trial error of federal constitutional law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless, and petitioner must win). The decision of the Mississippi Supreme Court involves an objectively unreasonable application of clearly established federal law. Petitioner is entitled to a new sentencing hearing.

## IV. Assistance of Counsel

Petitioner was indicted for capital murder with the underlying felony of burglary with the intent to commit an assault in a dwelling, and for kidnapping Cora. (*See* SCP Vol. 10, 1364). Carrie Jourdan, a part-time public defender, was appointed to represent Petitioner on September 22, 1999. (*See, e.g.,* SCP Vol. 9, 1345; SCP Vol. 10, 1419). Although the trial was initially set for February 22, 2000, the case was continued several times to complete Petitioner's requested mental examinations and to allow defense counsel time to prepare for trial. (*See, e.g.,* SCP Vol. 9, 1345; SCP Vol. 10, 1377-79; 1410, 1411, 1419). In the May 2001 term of court, the trial court set a motions hearing date of August 7, 2001 and a trial date of September 10, 2001. (*See* SCP Vol. 10, 1419). On the motions hearing date, the court entered an order extending the August 2001 term of court to hear Petitioner's case, and it directed the clerk to draw a panel of 300 jurors. (*See* SCP Vol. 10 at 1432).

34

Over time, Petitioner's family grew concerned that Jourdan was not acting in Petitioner's best interests. Johnnie Pearl Hodges was eventually put into contact with attorney Michael D. Miller, who agreed to represent Petitioner at trial for a retainer of $5,000. (*See* Evid. Hr'g Ex. 8, 13). Jourdan estimated that she was contacted by Miller sometime between early June 2001 and August 2001 and informed that he had been retained as counsel for Petitioner. (*See* Pet. Memo Ex. 18; Trial Tr. Vol. 13, 33-34; Evid. Hr'g Tr. Vol. II at 78).[10] Subsequent to the setting of the trial date, Petitioner fired Jourdan and officially retained legal representation from Miller, who was substituted as counsel for Petitioner on August 20, 2001. (*See* SCP Vol. 10 at 1447). Miller had been out of law school just over a year and admitted to the Mississippi Bar less than a year before the start of trial. He had never tried a case in circuit court. (*See* Trial Tr. Vol. 13, 48; Pet. Memo Ex. 16).[11]

Jourdan filed an affidavit and testified in this Court that she took no actions to prepare Petitioner's case for trial during her two-year representation, other than filing motions for discovery and for a mental examination. (*See* Pet. Memo Ex. 18, Aff. of Carrie A. Jourdan, May 30, 2008; Evid. Hr'g Tr. Vol. II at 80). Jourdan stated that the case was not in a posture to be

---

[10] Correspondence between Petitioner and Robert Glenn Waddle, the Director of the Consumer Assistance Program of the Mississippi Bar, dated July 16, 2001, demonstrates that Petitioner considered Jourdan his attorney at that time. (*See* Pet. Memo Ex. 27).

[11] The Court notes that Miller was not qualified under the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* [hereinafter "*Guidelines*"] to take on this representation. Specifically, the *Guidelines* in effect provided that lead counsel should have at least five years' litigation experience in the field of criminal defense; have served as lead counsel in no fewer than nine jury trials of serious and complex cases tried to completion as well as involvement as counsel or co-counsel on at least one death penalty case; be familiar with the practice and procedure of the criminal courts of the jurisdiction; be familiar and experienced with the utilization of expert witnesses and evidence; have attended and completed within one year of appointment, an educational program on criminal advocacy which focused on death penalty cases; and have demonstrated proficiency and commitment. *See Guideline* 5.1.

tried as of August 7, 2001, and that she informed Miller of that fact when he contacted her. (*See* Pet. Memo Ex. 18).

On the motions deadline date of August 24, 2001, Miller filed a motion for a continuance, or alternatively, a motion to withdraw. (*See* SCP Vol. 10, 1450-52). Miller did not notify the court that he had filed the motion for a continuance, and the court did not learn of its existence until the following Monday, August 27, 2001. (*See* SCP Vol. 11, 1523). When the court learned of the filing and attempted to reach Miller to inform him that his motion could be heard at 1:00 p.m. that day, his secretary, Brandy Hall, relayed a message that Miller was sick.[12] (*See id.*). The trial court informed Ms. Hall that it had reset the hearing for the following day at 9:00 a.m. Prior to this hearing time, Miller's secretary filed a letter and a doctor's excuse for August 27, 2001 through August 31, 2001. (*See id.* at 1523). The court then reset the hearing for 9:00 a.m. on August 31, 2001. (*See id.* at 1524).

In the interim, Miller consulted attorney Guy N. Rogers, Jr., who agreed to assist Miller as co-counsel at trial. On August 30, 2001, Rogers entered his appearance as co-counsel in the case and filed a motion to continue. (SCP Vol. 10, 1465; SCP Vol. 11, 1405). At the time of Petitioner's trial, Rogers had been involved in two death penalty cases. One case did not reach trial, and he sat second-chair in the other case. (Evid. Hr'g Ex. 10, 6-7). Miller failed to appear to have his motions heard on August 31, 2001. (*See* SCP Vol. 11, 1524).

On September 4, 2001, Miller requested a hearing on his and Rogers' motions to continue. The court held a hearing that morning. (*See id.* at 1524). Miller argued that

---

[12] Brandy Hall was known as Brandy Crisler at the time of Petitioner's trial, and the deposition given in conjunction with the Court's evidentiary hearing lists her as Brandy Wagoner. The Court retains the use of "Hall" for purposes of this Opinion and Order, as it is the name given on her affidavit.

Petitioner's rights to a fair trial and effective assistance of counsel would be violated if the trial commenced as scheduled, as he had not had sufficient time to investigate and prepare the case. (*See* Trial Tr. Vol. 13, 22). In the alternative, he requested that he be allowed to withdraw from the case. (*See id.* at 23). The court heard witness testimony on the motions. (*See id.* at 26-35). Carrie Jourdan testified at the hearing that she had been contacted by Miller and learned that he had been retained as counsel for Petitioner a day or two after August 7, 2001. (*See id.* at 33-34). Jourdan testified that once she learned that he had been retained, she advised Miller that it was crucial that he promptly file a motion for a continuance. (*See* Evid. Hr'g Tr. Vol. II, 80).[13]

The trial court swore in Miller and asked him questions relating to his knowledge of the trial setting prior to taking the case. (*See* Trial Tr. Vol. 13, 38). He stated that he knew of the September 10, 2001, trial date when he entered his appearance on August 20, 2001. (*See id.*). Miller admitted that he had not filed any other motions between the time of his appearance and the motion to continue, and the trial court asked him to list the motions he anticipated filing. (*See id.* at 39-40). Though the deadline for filing motions had passed, Miller informed the court that he anticipated filing motions for a change of venue, a privately-hired investigation, a mental examination to be paid for by Petitioner, and a motion for funds for an investigator. (*See id.*). Miller was unable to provide the court with the basis for his requests for a change of venue, further mental exam, and private investigator. (*See id.* at 39-40). When asked what other motions Miller felt needed to be filed to preserve Petitioner's due process rights, Miller deferred to co-counsel Rogers, who was not present at the hearing, to answer the trial court's inquiry. (*See id.* at 41). After noting that the trial was only six days away, the trial court elicited from

---

[13] Jourdan also testified at the evidentiary hearing held in this case on March 31, 2010. (*See* Evid. Hr'g Tr. Vol. II).

37

Miller that he had not looked at the juror questionnaires, had not read the entire court file, and had not interviewed or issued subpoenas for his witnesses. (*See id.* at 41-44). Miller refused to answer the trial court's question as to what work he had performed on the case since filing his entry of appearance in the case. (*See id.* at 42-44). The court overruled Miller's motion for a continuance and alternative release of counsel, and it likewise overruled Rogers' motion for a continuance. (*See id.* at 49). The court suggested that Miller "get busy," and the trial judge stated that he would hear any motions Miller needed to file. (*See id.* at 50).

Between September 4, 2001, and September 7, 2001, defense counsel filed several motions which were heard by the trial court on September 7, 2001. (*See* Trial Tr. Vol. 13, 53). Defense counsel renewed their motion for a continuance, the basis of which was that defense counsel had not yet been provided a videotape of the confession. (*See id.* at 60-61). The videotape was given to the defense prior to the hearing. (*See id.* at 61). The court denied the motion while noting that the confession had been reduced to writing, and that defense counsel was tendered the videotape in sufficient time in which to review it. (*See id.* at 61-62). Neither counsel presented the trial court with a motion for a mental examination or motions related to investigative services. (*See id.* 53-88). Petitioner's case proceeded to trial on September 10, 2001, with the Honorable John M. Montgomery presiding.

At trial, Miller was repeatedly warned against interrupting witnesses, arguing his case instead of questioning witnesses, and being rude. He was also chastised for being unfamiliar with the practices and procedures of trial. (*See, e.g.,* Trial Tr. Vol. 16, 587-91; Trial Tr. Vol. 17, 639, 643, 650-55; 716, 718, 722, 724, 726). After recessing the jury for a lunch break on September 12, 2001, the trial judge asked Miller to approach the bench and informed him that his

manner of cross-examining the witnesses was in violation of the rules.  (*See id.* at 746-47).  The trial judge offered Miller his rule book and suggested that he read it during the lunch recess.  (*See id.* at 747-48).  After the trial judge spoke to him about his manner of conducting his defense, Miller did not cross-examine any more witnesses and refrained from addressing the jury during closing argument at the guilt phase of Petitioner's capital murder trial.

Rogers states that Miller was wholly unprepared for trial, and that he made unnecessary objections and interruptions throughout the trial that clearly antagonized the judge.  (*See* Pet. Memo Ex. 8, Aff. of Guy N. Rogers, Jr., December 1, 2005).[14]  It is Rogers' opinion that Miller's appearance throughout trial was consistent with drug use, and he states that Miller openly stated one day after trial that he was going to smoke marijuana.  (*See id.*).  Rogers states that he was informed by the trial court that he needed to control Miller, but that Miller "mostly conducted the trial his way" despite Rogers' advice.  (*See id.*).  He also says that he personally witnessed Miller in "moments of intense depression" that manifested themselves in erratic behavior, such as Miller banging his head against the wall.  (*See id.*).  He maintains that Miller became paranoid, declaring at one point that white supremacists were after him.  (*See* Pet. Memo Ex. 10, Supp. Aff. of Guy N. Rogers, Jr., March 6, 2008).  Rogers asserts that Miller did not prepare Petitioner's family members to testify, opening the door to damaging testimony that Miller lacked the skills to correct through witness rehabilitation.  Rogers reiterated in the deposition that he gave during the course of federal habeas proceedings that the case was not investigated or prepared, and he states that he only agreed to enter an appearance in the case to serve as second-chair.  (*See, e.g.,* Evid. Hr'g Ex. 10).

---

[14]  The Court notes that Rogers, too, was corrected by the trial judge when Rogers was told to stand when he addressed the court.  (*See, e..g*, Trial Tr. Vol. 16, 591).

The affidavit of Miller's secretary, Brandy Hall, paints a similar picture. (*See* Pet. Memo Ex. 9, Aff. of Brandy M. Hall, November 28, 2005). Ms. Hall states that she, not Miller, met with Petitioner and his family about the case, and that Miller was using controlled substances and prescription narcotics during his representation of Petitioner. (*See id.*). She also states that Petitioner suffers from Bipolar Disorder, and she believes that Miller would not have accepted the case in a "sober state of mind." (*See id.*). She avers that she prepared all of the pretrial motions with the assistance of her father, who is an attorney, and Rogers. (*See id.*). She also states that Miller became suicidal on occasions after he accepted Petitioner's case, and that she prevented Miller from killing himself on one occasion by taking firearms from him. (*See id.*). Ms. Hall also asserts that Miller was not sick while preparing for Petitioner's trial, but rather, that he was unprepared and using drugs at the time. (*See id.*). She notes that Miller had no resources with which to try a capital murder case, and that he worked out of his mobile home. (*See id.*). In addition, she states that there was no mitigation investigation or mitigation plan prepared for the sentencing phase of Petitioner's trial. (*See id.*).

While Miller disagrees with Ms. Hall and Mr. Rogers' characterization of his behavior as bizarre or out of control, he does concede that there was no real preparation given for trial. (*See* Pet. Memo Ex. 15, Aff. of Michael D. Miller, November 7, 2002; Evid. Hr'g Ex. 8). Miller admittedly failed to appreciate the gravity of the task before him at the time he accepted the case. He states in his deposition that he took the case believing that it was actually a manslaughter case that the District Attorney's Office had "overcharged" so that it could be pled down. (*See* Evid. Hr'g Ex. 8, 35). Even after he realized that it would proceed as a capital murder case, and that it would proceed to trial on schedule, he failed to ensure that he and his co-counsel had clear roles.

40

Miller and Rogers each expected the other to take the lead at trial, and they both admit that only the most minimal of preparations were conducted for the sentencing phase. (*See, e.g.*, Evid. Hr'g Ex. 8, 10).

Miller states that he did not attempt to gather impeachment evidence against State witnesses, and that though he advised Petitioner not to testify at sentencing, he did not have time to prepare Petitioner for his testimony. (*See* Pet. Memo Ex. 15). Miller avows that he was sick during the week of August 27 through August 31, and that he only had fifteen working days to prepare for trial. (*See id.*). He states that, after the motion for continuance was denied by the trial judge, the preparation and investigation time was compressed to an "impossible window." (*See* Evid. Hr'g Ex. 8, 24-25; 40). Miller states that he fully believed that Rogers would take the lead at trial, and that he did not know how to properly present some of the evidence at trial, such as the letters that Cora wrote to Petitioner. (*See id.* at 32, 90-91). Therefore, he maintains, important testimony was never presented to the jury.

Miller never sought the assistance or advice of an expert to provide testimony in mitigation at sentencing, but he did contact Dr. Phillip Merideth, a doctor at the State Hospital who evaluated Petitioner for competency to stand trial, to determine whether the letters from Cora to Petitioner would change the opinions he had offered. (*See* Pet. Memo Ex. 15). As Miller did not contact him until September 11, 2001, however, Dr Merideth was not available to testify, and he otherwise informed Miller via voicemail that the letters would not have changed the opinion he previously rendered. (*See id.*). Miller admits that once the case reached the mitigation stage, he put on whoever was present to testify. He also admits that he did not know what the witnesses would say when they testified. (Evid. Hr'g Ex. 8, 111).

41

During trial, Miller admits to taking Adderall and Valium to control his Attention Deficit Disorder and Anxiety Disorder. (Evid. Hr'g Tr. Ex. 8, 71). He admits that he was "self-destructing" during the trial, and his trial notes included statements such as "[w]hat am I doing here, God? I will get to leave, [r]ight?" (Evid. Hr'g Ex. 8, 75 and Ex 8M). Another trial note states: "This is too much. This is far too much. I want to go home. H.O.M.E. H.O.M.E. H.O.M.E." (*See id.*). Yet another note reads: "So, the rules of court and evidence prevent the truth from ever being heard in the court of man. Then what the heck am I doing here? Losing my mind - Losing my soul - Losing my God - Losing my self." (*See id.*).[15] A post-trial letter from Miller to Petitioner, dated December 23, 2001, explains Miller's advice on a motion enclosed with the letter and suggests that it necessary to improve the relationship between them to improve Petitioner's chances on appeal. (*See* Pet. Memo Ex. 14). Miller goes on to state that Petitioner's prior correspondence contained a veiled threat, and he states to Petitioner:

> You are in no position to threaten me and, just so you know, the only thing I fear in this world is God and if anybody ever comes up on me and try to test me I've got a 12 gauge and a .44 and a steady hand waiting for them - God rest the souls and have mercy on anybody who ever decides to test me - because I will show no mercy. I want you to understand that. (*See id.*).

Miller's mental stability continued to disintegrate, and on January 21, 2003, Miller's parents initiated commitment proceedings against him. (*See* Pet. Memo Ex. 13). The medical history associated with those proceedings indicates that Miller has a history of alcohol and drug abuse, as

---

[15]   In the deposition presented to this Court during the course of the evidentiary hearing in this matter, Miller also states that he began to undergo a personality disintegration during this trial. (*See* Evid. Hr'g Tr. Vol. 1, 68-70). Miller maintains that one of the State's witnesses sexually abused him when Miller was five years old, and that he recovered memories of the alleged abuse in connection with this case. (*See id.*).

well as a diagnosis of Bipolar Disorder.  (*See id.*).  Petitioner was involuntarily committed to the

East Mississippi State Hospital on January 24, 2003.  (*See id.*).  After his release, Miller left the

State of Mississippi and the practice of law.  (*See, e.g.*, Evid. Hr'g Ex. 8, 130).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant

the right to the effective assistance of counsel.  *See, e.g., Yarborough v. Gentry*, 540 U.S. 1, 5

(2003).  A federal habeas petitioner's claim that he was denied the effective assistance of counsel

at trial is generally measured by the two-pronged test set forth in *Strickland v. Washington*, 466

U.S. 668 (1984).  To prevail on a claim of ineffective assistance of counsel, Petitioner must

establish that (1) his trial counsel's performance was so deficient that it cannot be said that he

was functioning as "counsel" within the meaning of the Sixth Amendment, and (2) the deficient

performance prejudiced his defense.  *See id.* at 687; s*ee also Boyle v. Johnson*, 93 F.3d 180, 187

(5th Cir. 1996) (ineffective assistance of counsel claims analyzed under *Strickland* framework).

Where an attorney's representation falls below an objective standard of reasonableness as

determined by professional norms, that performance is deficient.  *See Rompilla v. Beard*, 545

U.S. 374, 380 (2005); *Strickland*, 466 U.S. at 687-89.  Courts scrutinizing counsel's performance

assume a "strong presumption" that the assistance was adequate and "that the challenged conduct

was the product of reasoned trial strategy."  *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996)

(citation omitted).  This presumption may be overcome if a petitioner can identify acts or

omissions of counsel that were not the result of a reasoned, professional judgment.  *See*

*Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).  However, even unreasonable errors by

counsel do not warrant relief if the errors did not effect the judgment.  *See Strickland*, 466 U.S. at

691.  Rather, actual prejudice results from the errors of counsel when there exists a reasonable

probability that, but for the errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* The failure to prove either deficient performance by counsel or actual prejudice as a result of counsel's actions or omissions defeats a claim of ineffective assistance. *See Strickland*, 466 U.S. at 397; *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998); *Smith v. Puckett*, 907 F.2d 581, 584 (5th Cir. 1990). As claims of ineffective assistance of counsel involve mixed questions of law and fact, claims previously considered and rejected by the State court may be overturned only if "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Strickland*, 466 U.S. at 698; 28 U.S.C. § 2254(d)(1). Counsel's failure to preserve a claim in State court can in some circumstances constitute cause sufficient to overcome a procedural default. *See Coleman*, 501 U.S. at 753-54. However, a petitioner claiming ineffective assistance of counsel for the purpose of having the underlying substantive claim reviewed on its merits must ordinarily have presented the ineffective assistance of counsel claim independently in State court before it may be argued as cause to excuse a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451(2000).

<u>Failure to Address the Claim, or Alternatively, Failure to Address Under *Cronic*</u>

Petitioner maintains the Mississippi Supreme Court failed to recognize and remedy the presumptive prejudice he suffered as a result of his attorney's failure to provide "adequate legal assistance" throughout the capital proceedings, and that it was error for the court to fail to analyze Petitioner's ineffective assistance of counsel claims under the standard set forth in *United States v. Cronic*, 466 U.S. 648, 653-54 (1984). In *Cronic*, the United States Supreme Court held that where the circumstances at trial "are so likely to prejudice the accused that the

44

cost of litigating their effect in a particular case is unjustified," prejudice to a defendant is automatically assumed. *See Cronic*, 466 U.S. at 658. *Cronic* set forth three situations involving the right to counsel with circumstances so likely to result in prejudice that prejudice is presumed. *See id.* at 658-59. The first is the "complete denial of counsel," where the presence of counsel is absent at "a critical stage." *Id.* at 659. Second, prejudice is presumed if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* Third, prejudice is presumed where counsel is called upon to render assistance in situations where competent counsel very likely could not. *See id.* at 659-64.

At the outset, the Court notes that most right to counsel claims are governed by the standard of *Strickland*. *See Childress v. Johnson*, 103 F.3d 1221, 1228 (5th Cir. 1997); *McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990) ("[B]ad lawyering, regardless of *how* bad, does not support the presumption" of prejudice under *Cronic*); *Woodard v. Collins*, 898 F.2d 1027, 1029 (5th Cir. 1990) (holding decision to investigate some issues and not others or even a decision to conduct virtually no investigation is governed by *Strickland* and its progeny). The rule of presumptive prejudice set forth in *Cronic* is a "narrow exception" to *Strickland* and is sparingly used. *See Florida v. Nixon*, 543 U.S. 175, 190 (2004). In both his direct appeal and post-conviction proceedings, Petitioner argued that he was denied effective assistance "at all stages of his capital murder prosecution," citing both *Strickland* and *Cronic* in support. However, none of the ineffective assistance claims raised in Petitioner's brief on direct appeal or in his petition for post-conviction relief argue that counsel's performance should be deemed presumptively prejudicial. (*See* Briefs Vol., 33-56; PCR Vol. 2, 18-48). In fact, Petitioner argued in both briefs that he was prejudiced pursuant to *Strickland* standards by trial counsel's

45

performance. In both his direct appeal and post-conviction briefs, Petitioner cites, at the conclusion of his ineffective assistance of counsel claims, the *Strickland* standard. (*See* PCR Vol. 2, 48; Briefs Vol, 55 of "Original Brief of Appellant"). Therefore, the Court finds Petitioner has not demonstrated that the Mississippi Supreme Court failed to address the claim presented to it. Nor has Petitioner demonstrated that the court's failure to consider this claim under *Cronic* warrants federal habeas relief.

At Petitioner's trial, the court entered an order after hearing Miller's argument on September 4, 2001 on his motion for a continuance and alternative motion to withdraw. (*See* Trial Tr. Vol. 13, 20-49; SCP Vol. 11, 1521-27). In its order, the court overruled the motions, finding that "the seriousness of the offense, the amount of time between the alleged crime and the date of trial, the defendant having escaped twice, the State's material witnesses leaving the jurisdiction of this Court, defendant's intentional changing of defense counsel after a special setting, and the time guidelines set by the Mississippi Supreme Court, feels that justice demands this case be tried on the merits without further delay." (*See* SCP Vol. 11, 1527). At the hearing on motions on September 7, 2001, counsel renewed their motion for continuance. (*See* Trial Tr. Vol. 13, 55). The court denied the renewed motion, noting that Petitioner's request for additional time was made "because he has hired new counsel at seemingly the eleventh hour." (*See* Pet. Memo Ex. 21). In its recitation of facts, the Mississippi Supreme Court did find that the trial court determined Petitioner retained new counsel for the purpose of delaying the trial. *See Hodges I*, 912 So.2d at 747. The Mississippi Supreme Court relied upon the fact that Petitioner fired his court-appointed attorney and hired new counsel to reject Petitioner's claim that trial counsel did not have sufficient time to prepare a case in mitigation. *See Hodges I*, 912 So.2d at

764.  Petitioner essentially urges the Court not to consider the fact that Miller and Rogers were retained as counsel less than a month before trial in evaluating his ineffective assistance of counsel claims under the *Cronic* standard.   The fact that the court inferred a dilatory purpose from matters not apparent in the record does not entitle Petitioner to relief on his claim.

In this case, Miller had only recently been hired, had no experience in trial court, and missed several hearings.  These facts, when considered with the fact that his trial performance appears, from a charitable view, to have been awkward and confused,  should have concerned the trial court as to whether the defendant had adequate counsel.  However, Petitioner had a qualified right to secure counsel of his own choosing to represent him at trial.  *See Powell v. Alabama*, 287 U.S. 45, 53 (1932).  That right is countervailed by the likewise protected Sixth Amendment right of the State to proceed in an orderly and expeditious manner with prosecutions, while taking into account the practical obstacles to "assembling the witnesses, lawyers, and jurors at the same place at the same time." *Morris v. Slappy*, 461 U.S. 1, 11 (1983).  As competent counsel might have performed sufficiently despite the time constraints, Petitioner may not assert a lack of adequate preparation time as a ground for relief based on a presumption of ineffective assistance of counsel.  *See, e.g., Avery v. Alabama*, 308 U.S. 444, 450-53 (1940) (counsel appointed in capital case three days before trial and denied additional time to prepare not denied right to effective assistance).  To the extent Petitioner seeks to base his ineffective assistance of counsel claims on the Mississippi Supreme Court's factual determination with regard to this issue, he is not entitled to relief and must demonstrate deficient performance by counsel and resulting prejudice as to his claims.  Having rejected Petitioner's contention that *Cronic* is applicable to the facts of this case, the Court considers Petitioner's claims of error by counsel to be considered

47

pursuant to *Strickland* principles. The Court addresses the individual errors asserted prior to reaching a conclusion as to aggregate error, and it discusses Petitioner's claims according to the phase of trial in which the alleged errors occurred.

## A. Guilt Phase

Prosecution Witnesses

Petitioner maintains that trial counsel failed to provide effective assistance by failing to investigate and confront Anthony Betts and Cora Johnson, two key prosecution witnesses. On direct appeal, the Mississippi Supreme Court rejected Petitioner's claim that counsel rendered ineffective assistance in failing to impeach Anthony Betts with his prior conviction of burglary, as Petitioner could not demonstrate any prejudice as a result. *See Hodges I*, 912 So.2d at 762-63.[16] On post-conviction review, the Mississippi Supreme Court held that trial counsel's failure to impeach Anthony Betts with his prior conviction of burglary "was mostly cumulative, and without it there was ample testimony to support a conviction." *Hodges II*, 949 So.2d at 718. Also on post-conviction review, the court considered whether counsel performed ineffectively in failing to confront Cora Johnson with letters she wrote to Petitioner while he was incarcerated to establish that she vacillated in her feelings for Petitioner. *See id.* at 718. It also considered whether counsel rendered ineffective assistance in failing to offer the testimony of Petitioner's niece, Lakasha Hodges, who would have testified that Cora called Petitioner repeatedly on the night Isaac was shot. *See id.* at 718. The court found that "this information might have been helpful, and defense counsel should have been aware of it, [but] its persuasive effect is

---

[16] In his reply brief, Petitioner argues that Betts was sentenced to the RID program upon his plea of guilty, and that counsel could have undermined the State's theory that Petitioner had received a "break" as a result of Ms. Tatum's intervention by presenting the evidence. (Pet. Reply 11; *see also* Pet. Memo Ex. 53, "Sentencing Order for Anthony Betts," dated February 23, 2000).

questionable" as Petitioner broke into her home and murdered her brother.  *See id.* at 718.

It is a well-established principle that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 690-91.  Miller filed an affidavit with the State court admitting that he "was too busy with paperwork to attempt to gather impeachment evidence," despite his suspicion that some of the State's witnesses might have criminal records.  (*See* Pet. Memo Ex. 15 ¶ 7).  The Court assumes counsel performed deficiently in failing to learn of Betts' criminal history, as it does not appear as though counsel's failure to do so is linked to any trial strategy.  However, it is not enough that counsel should have investigated Betts and Cora and failed to do so.  Petitioner must show how the investigation would have made a difference at trial.

Anthony Betts, a friend who had known Petitioner for two or three years at the time of trial, testified for the State at the guilt phase.  (*See* Trial Tr. Vol. 17, 658-663).  Betts testified to the events during the evening hours of July 20, 1999, when Petitioner was attempting to arrange a visit with Cora.  (*See id.* at 660-63).  The only potentially damaging information elicited from Betts was his statement that the weekend before Isaac was killed, Petitioner said that he was going to buy a gun and kill someone with it.  (*See id.* at 660).  Betts' testimony established that he did not know what happened the night that Isaac was killed, and he also testified that he last saw Petitioner around 11:00 p.m. on the night of the murder.  (*See id.* at 665-66).

Also at trial, defense counsel confronted Cora with a series of letters she wrote to Petitioner while he was incarcerated on the prior burglary charge of the Johnson home.  (*See, e.g.,* Trial Tr. Vol. 17, 601-639).  The jury heard some of the content of those letters, including

Cora's professed love for Petitioner, her taunts to Petitioner about her relationships with other men, and her uncertainty about whether Petitioner was the father of her child. (*See id.*). While Lakasha's testimony might have added support to the proposition that Cora was initiating and leading Petitioner on, there was also testimony from Corporal Mark Miley with the Lowndes County Sheriff's Department that the Caller Identification box at the Johnson home showed calls to Cora's home from the Hodges' home on July 20, 1999 and July 21, 1999. (*See, e.g.,* Trial Tr. Vol. 18, 779-80).[17]

The Court does not find it unreasonable to conclude that Petitioner was not prejudiced by trial counsel's failure to introduce the omitted evidence. Petitioner confessed that he got off of the telephone with Cora on the night of July 20, 1999, and that he went home and retrieved his mother's pistol and her car. (*See* Trial Tr. Vol. 18, 808-07). He said he drove to the Johnson home, parked two houses away, and entered the back door of the house. (*See id.*). Cora testified that when Petitioner entered her room, he was wearing black shoes, pants, gloves, a black shirt, and a beige mask. (*See* Trial Tr. Vol. 16, 563). She testified that he struck her in the head with a gun and forced her to leave with him. (*See id.* at 564). Cora stated that while she was being held against her will with Petitioner, he told her that he had gone to her house with the intention of killing her and her mother, had she been there. (*See id.* at 568). Petitioner has not shown that it was unreasonable to conclude that the omitted evidence would have altered the jury's verdict of guilt, and this claim shall be dismissed.

 Plea Bargain

---

[17] There was a call from Reginald Martin's home to the Johnson residence at 9:27 p.m. on July 20, 1999. (*See id.* at 780). The last call from the Hodges home to the Johnson home occurred at approximately 12:14 a.m. on July 21, 1999. (*See id.* at 779).

Prior to the start of Petitioner's trial, the State offered him a plea bargain whereby he would plead guilty to capital murder in exchange for a life sentence without the possibility of parole. (*See* SCP Vol. 13, 103-04). Petitioner maintains that based on counsel's erroneous advice that he would be eligible for a sentence of life with the possibility of parole, he rejected the State's offer. (Pet. Memo Ex. 24, 61). Petitioner argues that this Court should vacate his conviction and sentence, as he did not have the opportunity to make an informed decision about the plea offer. The Mississippi Supreme Court rejected Petitioner's claim on direct appeal, finding that as he could not prove that but for his attorney's error he would have accepted the plea offer. *See Hodges I*, 912 So.2d at 763. The court found Petitioner expressed no desire to plead guilty prior to his conviction, and that his after-the-fact affidavit was insufficient to prove prejudice. *See id.*

On the first day of trial, defense counsel Rogers informed the trial court that he had spoken to the District Attorney about the possibility of a plea, which was then discussed with Petitioner. (*See* Trial Tr. Vol. 13, 103). Rogers informed the court that the recommendation made by the State was life without parole. (*See id.*). The court questioned counsel about whether he had advised Petitioner of the sentencing options, which the court stated as "not guilty, death penalty, life without parole, or life." (*See id.*). Rogers stated he had discussed with Petitioner the three potential sentences Petitioner would face if convicted. (*See id.*). Rogers informed the court that Petitioner had chosen not to accept the plea offer, and Petitioner confirmed that fact to the trial court. (*See id.* at 104). The affidavit submitted by Petitioner in his State court proceedings states that he decided to reject the offer and "take [his] chances" at trial in hopes he might receive a sentence of life with the possibility of parole. (*See* Pet. Memo Ex.

51

24).

To the extent Petitioner argues that the sentencing options given to the jury constitute objective evidence of his attorney's ineffectiveness, he fails to persuade the Court that his claim warrants relief. The fact that trial counsel should have known of the correct sentencing options does not constitute prejudice in this matter, as Petitioner cannot demonstrate that there is a reasonable probability that but for counsel's errors he would have accepted the agreement. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (determining that the issue of prejudice is "whether counsel's constitutionally ineffective performance affected the outcome of the plea process").[18] Petitioner's affidavit, standing alone, is insufficient to establish prejudice. The Fifth Circuit has consistently held that a petitioner's conclusory, self-serving allegation will not form the basis for habeas relief. *See Beazley v. Johnson*, 242 F.3d 248, 270 (5th Cir. 2001) (conclusory allegations will not support federal habeas relief); *Fahle v. Cornyn*, 231 F.3d 193, 196-97 (5th Cir. 2000) (self-serving allegations do not merit relief); *McDonald v. Johnson*, 139 F.3d 1056, 1058-60 (5th Cir. 1998) (finding court did not abuse discretion in finding petitioner's claim lacked arguable basis in fact where court "observed the absence of supporting evidence other than the petitioner's own self-serving allegations" that his attorney did not explain his right to appeal); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *United States v. Sanderson*, 595 F.2d 1201 (5th Cir. 1979) (affidavit of reliable third party corroborating habeas petitioner's affidavit may entitle him to evidentiary hearing, self-serving statements do not).

The Court also rejects the notion that the decision of the Mississippi Supreme Court held

---

[18] The Court notes, for example, that a December 2000 report from the Mississippi State Hospital documents that Petitioner stated he would reject a plea offer if offered one. (*See* Evid. Hr'g Ex. 35EE).

Petitioner to a higher burden than is required under *Strickland*.  The court cited the standard for

demonstrating prejudice prior to engaging in a discussion of the individual claims.  *See Hodges I*,

912 So.2d at 758-59.  The Mississippi Supreme Court held Petitioner had failed to submit

sufficient evidence that he would have accepted the plea offer but for his attorney's failure to

properly advise him of the correct law.  *See id.* at 763.  The Court finds Petitioner has failed to

demonstrate that the Mississippi Supreme Court reached a decision contrary to or involving an

unreasonable application of clearly established law in requiring Petitioner to submit other

evidence in support of his allegation he would have accepted the plea, and the Court finds the

decision did not impose a  higher burden of proof than required by *Strickland*.

Motion to Suppress

    Petitioner argues counsel rendered ineffective assistance in failing to investigate the facts,

properly prepare a sufficient motion, and present evidence in support of the motion to suppress

his confession.  He additionally asserts that counsel failed to impeach the testimony of Kevin

Pitre of the Lowndes County Sheriff's Department.  Officer Pitre, along with Detective Joe

Young, was the first officer to question Petitioner and secure a confession from him.  Petitioner

maintains that Officer Pitre's testimony given at the suppression hearing was inconsistent with

the testimony offered at the preliminary hearing, and that counsel's failure to cross-examine

Officer Pitre about the inconsistencies was  constitutionally deficient performance.

    On direct appeal, the Mississippi Supreme Court found Officer Pitre did not give

inconsistent testimony, thus counsel did not perform deficiently in failing to question him about

the alleged disparity.  *See Hodges I*, 912 So.2d at 760-62.  The court also rejected Petitioner's

claim that counsel performed deficiently in failing to introduce evidence that Officer Pitre

allegedly informed him that he would be charged with manslaughter if he gave a statement.  *See id.* at 761-62.  The court also determined that it would not "second guess" the attorney's decision not to put Petitioner on the stand during the suppression hearing to testify to the allegation.  *See id.*  The court noted that Petitioner turned himself in to law enforcement, he stated he wanted to make a statement, and that no evidence of coercion existed with regard to the confession.  *See id.*

On July 21, 1999, Petitioner turned himself into the Lowndes County Sheriff's Department and Officer Pitre secured a waiver of rights form from him.  (*See* Trial Tr. Vol. 16, 516-520).  Thereafter, Petitioner was taken to an interview room and questioned by Detective Joe Young, with Officer Pitre acting as a witness.  (*See id.* at 521).  At the preliminary hearing held in this case on October 19, 1999, Officer Pitre testified.  (*See* Pet. Memo, Ex. 56).  On cross-examination by Carrie Jourdan, Pitre testified that Petitioner did not request an attorney when giving his statement.  (*See* Pet. Memo Ex. 56, 12).  Officer Pitre said that Petitioner did ask what his sentence would be if he was convicted of capital murder for Isaac's death.  (*See id.*).  At the suppression hearing held on September 11, 2001, the prosecutor asked whether Petitioner had any question prior to signing the waiver of rights form, to which Officer Pitre testified that Petitioner "indicated he didn't have a question or didn't have a problem with the rights."  (*See* Trial Tr. Vol. 16, 527).  It is clear from the record that Officer Pitre testified at the suppression hearing that Petitioner did not have any questions about his rights prior to executing the waiver of rights form, and the Mississippi Supreme Court did not make an unreasonable determination of facts in concluding this testimony was not inconsistent with the testimony given at the preliminary hearing.  As there was no inconsistency with which to impeach Officer Pitre's testimony, counsel was not deficient in failing to do so.  *See, e.g, Emery v. Johnson*, 139 F.3d

191, 198 (5th Cir. 1997) (holding that "failure to assert a meritless objection cannot be grounds for a finding of deficient performance"). As Petitioner has not demonstrated that he is entitled to relief based upon the Mississippi Supreme Court's adjudication of the first prong of *Strickland*, he is not entitled to relief and the Court has no need to address the prejudice prong. *See Kirkpatrick v. Blackburn*, 777 F.2d 272, 285 (5th Cir. 1985) ("If proof of one element is lacking, the court need not examine the other.").

Petitioner does not here argue that trial counsel performed deficiently in failing to put him on the witness stand to testify at the suppression hearing. Out of an abundance of caution, however, the Court finds that Petitioner has not demonstrated that he is entitled to relief under the AEDPA based on any implied claim that trial counsel failed to present evidence that Petitioner was informed he would receive a maximum sentence of manslaughter if he gave a statement to police. Officer Pitre and Detective Young each testified that no promises were made to Petitioner to induce him into giving a statement. (*See* Trial Tr. Vol. 16, 527, 541-42). There was testimony that Petitioner voluntarily surrendered himself to law enforcement officials, that he was advised of his right against self-incrimination and right to an attorney, that the statement was not the product of coercion, threat, or promises, and that Petitioner had a sufficient understanding of the rights he was waiving prior to signing the waiver form. (*See, e.g.,* Trial Tr. Vol. 16, 515-544). Therefore, the Court determines Petitioner has failed to establish that he was prejudiced by trial counsel's failure to present additional evidence at the suppression hearing, even if counsel could be found deficient in their preparation.

Conclusion Regarding Guilt Phase Claims

The record establishes that Petitioner's counsel were not adequately prepared for trial.

However, Petitioner confessed that he took his mother's pistol and car, and that he drove to the Johnson home wearing black clothing, gloves, and a ski mask. (*See, e.g.,* Trial Tr. Vol. 16, 563; Trial Tr. Vol. 18, 807-08). The jury heard evidence that Petitioner hit Cora in the head with the pistol and forced her to leave with him, and that he subsequently told her he had gone to her house with the intention of killing her and her mother. (*See, e.g.,* Trial Tr. Vol. 16, 564, 568). The jury was presented with evidence that Petitioner voluntarily surrendered himself to law enforcement officials and gave a voluntary statement admitting that he shot Isaac Johnson. The overwhelming evidence of Petitioner's guilt and his intent precludes the Court from determining that the Mississippi Supreme Court was unreasonable in determining Petitioner was not prejudiced by any deficiencies of counsel during the guilt portion of his trial. *See, e.g., Pondexter v. Quarterman*, 537 F.3d 511 (5th Cir. 2008) (overwhelming evidence of defendant's guilt precluded his demonstrating prejudice as required to establish ineffective assistance of counsel); *Leal v. Dretke*, 428 F.3d 543 (5th Cir. 2005); *Green v. Johnson*, 160 F.3d 1029 (5th Cir. 1998).

Additionally, Petitioner has not demonstrated that he is entitled to relief on any ineffective assistance claim asserted concerning the guilt phase of his trial, and therefore, he is not entitled to relief based upon an allegation of cumulative error by counsel. *See Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc) (holding habeas relief may be granted on the cumulative effect of errors where the individual errors are of constitutional dimension, they are not procedurally defaulted, and they so infected the entire trial that the resulting conviction violates due process). As Petitioner has not demonstrated that trial counsel's performance undermines confidence in the verdict of guilt, all of the claims relating to the assistance trial

counsel rendered during the guilt phase of Petitioner's trial are dismissed. *See Strickland*, 466 U.S. at 694.

### B.  Sentencing Phase[19]

The Mississippi Supreme Court rejected Petitioner's claims of ineffective assistance based upon counsel's failure to investigate and present all available mitigating evidence. *See Hodges I*, 912 So.2d at 764-67; *Hodges II*, 949 So.2d at 718-720.  The Court here reviews many of the rejected claims while mindful that judicial scrutiny of the performance of counsel must avoid "second-guessing" counsel's decisions and concluding with the benefit of hindsight that an unsuccessful strategy was unreasonable. *See Strickland*, 466 U.S. at 689.

The Court has already recounted several facts pertaining to the assistance rendered by Petitioner's trial attorneys.  The Court here additionally notes that even though there was no theory or plan of mitigation, trial counsel did present the testimony of five of Petitioner's family members and the testimony of Petitioner himself at the sentencing phase of trial.  (*See* Pet. Memo Ex. 10; Evid. Hr'g Tr. Vol. I, 114-15; Evid. Hr'g Ex. 8, 111).  The jury learned that Petitioner's parents were never married, and that while Petitioner frequently visited with his father, they were never particularly close.  (*See* Trial Tr. Vol. 19, 945, 965, 969, 972).  Testimony was offered that Petitioner was a sickly child who was soft-spoken, non-violent, and extremely close to his mother.  (*See id.* at 945, 946, 952, 954, 957-58, 965, 969, 979).  Family members testified that Petitioner began experiencing problems when the family moved near the Caledonia community and Petitioner's relationship with Cora began.  (*See id.* at 956, 959-960, 973-74, 976).  The jury

---

[19]  As the Court has already determined that Petitioner is entitled to a new sentencing hearing, it finds it unnecessary to address every ineffective assistance of counsel claim raised with respect to the sentencing phase of Petitioner's capital murder trial.

learned that Petitioner was expelled from one school in the ninth grade, and that he eventually dropped out altogether. (*Id.* at 974-75; 1003-04). Evidence was presented that Petitioner was attempting to obtain his GED at one time, but that he had so many problems with authorities as a result of his relationship with Cora that he stopped attending the classes. (*See id.* at 975). There was also testimony presented that Cora aggressively pursued a relationship with Petitioner, and that they sneaked around to see one another at the home of Cora's cousin after Petitioner's release from the RID program. (*See id.* at 978, 996-97).

Many of the affidavits submitted in support of this claim on post-conviction review mimic the testimony given at trial while adding a few potentially helpful details about Petitioner's life and background. (*See, e.g.,* Pet. Memo Ex. 33, Aff. of Joseph Griffin, June 23, 2006; Ex. 34, Aff. of Linda Hodges, June 23, 2006; Ex. 35, Aff. of Kanesha Hodges, June 23, 2006; Ex. 41, Aff. of Joann Latz, October 1, 200; Ex. 42, Aff. of Lisa Pearl Hodges, June 23, 2006; Ex. 43, Aff. of Martha Hodges, June 23, 2006). A full investigation would have revealed that Ms. Hodges smoked cigarettes and drank alcohol throughout her pregnancy with Petitioner, and that her alcohol consumption was sometimes so excessive that she required hospitalization. (*See* Pet. Memo Ex. 40, 41, 42). The affidavits allege that Cora manipulated Petitioner's feelings for her, and he believed her claim that he was the father of her child. (*See* Pet. Memo Ex. 31, 33, 35, 36, 39, 40, 42, 43).

Petitioner was sent to the Mississippi State Hospital for a forensic evaluation prior to trial upon Jourdan's motion for a mental examination. Dr. Philip Merideth and Dr. R. McMichael were ordered to conduct an evaluation in connection with Petitioner's pending capital murder and kidnapping charges to assist the court in determining Petitioner's competency to proceed with

58

trial; his mental state at the time of the offense alleged; any mitigating circumstances, particularly whether the charged offense was committed while Petitioner was under extreme mental or emotional distress; and whether he was competent to waive or assert his constitutional rights. (*See* Evid. Hr'g Ex. 16).  Their December 14, 2000 report contained the opinion that Petitioner was competent, that he was not acting under the influence of extreme mental or emotional distress at the time of the crime, and that while he displayed average intellectual functioning and no symptoms of mental illness, Petitioner's limited education and drug abuse were possible mitigating factors.  (*See id.*).  The report also included that Petitioner reported feeling "angry and depressed" at the time of the offenses and "reportedly had a conflictual relationship with the alleged kidnapping victim."  (*See id.*).  Miller did not request subpoenas for anyone at the Mississippi State Hospital to testify at Petitioner's trial, but he contacted Dr. Merideth on September 11, 2001.  (*See* Pet. Memo Ex. 15).  Miller sent Dr. Merideth some of the letters Cora wrote to Petitioner to determine whether the doctor could provide help in mitigation.  (*See id.*).  September 11, 2001, was the second day of trial.  Dr. Merideth informed Miller that he could not appear on such short notice and that his opinion had not changed.  (Trial Tr. Vol. 19, 933). Miller did not think his testimony would be helpful, and the trial court noted that counsel had made a strategic decision not to call Dr. Merideth as a witness.  (*See id.* at 934).  Neither of the December 14, 2000, reports from the Mississippi State Hospital were presented at Petitioner's trial.  (*See, e.g.,* Pet. Memo Ex. 47, 48; Evid. Hr'g Ex. 16 and 17).[20]  The potentially mitigating factors contained in the report were not explored by an expert prior to or at trial.

On post conviction review, Petitioner supplemented his claim that trial counsel should

---

[20]   One evaluation related to Petitioner's November 20, 1999, jail escape charge.

have secured and presented expert assistance with the reports of Dr. Karen Wiviott and Dr. Marc Zimmerman.  Dr. Wiviott conducted a psychiatric evaluation of Petitioner on June 19, 2006, and she concludes that the disruption in his parental relationships during his formative years left him particularly sensitive to rejection and vulnerable to abandonment.  (*See* Pet. Memo Ex. 49).  Dr. Wiviott concludes that Cora's "inconsistency in the preceding months and weeks and her betrayal on the night of July 20, 1999 had a profound effect on [Petitioner] that contributed significantly to his actions on that night."  (*See id.*).[21]  At the federal evidentiary hearing held on March 31, 2010, this Court heard testimony from Dr. Antionette Kavanaugh, a clinical psychologist with a specialty in adolescent psychological development, concerning the mitigating evidence that was available and should have been presented at Petitioner's capital murder trial.  Dr. Kavanaugh reviewed Petitioner's medical, social services, and psychiatric/psychological history as part of her evaluation in this case, and much of that history has been attached as exhibits to her report.

Dr. Kavanaugh testified that the chronic level of poverty in Petitioner's home when he was growing up resulted in a focus on meeting physical needs, and that Petitioner's emotional needs went unfulfilled as a result.  (Evid. Hr'g Tr. Vol. II, 6-7).  For instance, records from the time Petitioner was three years old show that a total income of less than $500 per month supported the five family members living in the Hodges' household.  (*See id.* at 9; Ex. 35J).  Petitioner, who was on Medicaid, often had to seek emergency room treatment for his asthma,

---

[21]  On June 23, 2006, Dr. Marc Zimmerman conducted an evaluation of Petitioner and determined that Petitioner is suffering symptoms commonly associated with Post Traumatic Stress Disorder.  (*See* Pet. Ex. 50).

and his symptoms often went unaddressed for days before treatment was sought. (*See id.* at 11-13). Other records repeatedly reference the fact that Ms. Hodges appeared to be tired of raising children, and Dr. Kavanaugh notes that such records show that it is unlikely that Ms. Hodges could have met her children's needs if she was unable to meet her own. (*See id.* at 17-18; 22, Ex. 35S). For example, numerous hospital records document Ms. Hodges' admissions with alcohol intoxication and/or dependence when Petitioner was between two and twelve years of age. (*See* Evid. Hr'g Ex. 35L, 35M, 35N). Ms. Hodges also took Valium to treat anxiety and insomnia problems. (*See* Evid. Hr'g Ex. 35P). During at least part of Petitioner's childhood, Ms. Hodges had the additional stress of attempting to care for her mother, who had Alzheimer's. (*See* Evid. Hr'g Tr. Vol. II, 30; Ex.35P).

While struggling with her own depression and addictions in the midst of this poverty, Ms. Hodges and Petitioner's father, Wren Blair, had a contentious relationship that involved years of legal proceedings to address child support and custody issues. (*See* Evid. Hr'g Ex.35Y). Dr. Kavanaugh reports that Ms. Hodges often belittled Petitioner, particularly when he would return from visits with his father. (Evid. Hr'g Tr. Vol. II, 32). Records establish that community counseling workers encouraged Ms. Hodges to praise Petitioner, but that praise was lacking in the home. (*See id.* at 38). Dr. Kavanaugh believes that Petitioner's own alcohol and cannabis dependence led Petitioner to be extremely impulsive, and when he dropped out of high school, he had more free time to associate with negative influence peers. (*See* Evid. Hr'g Tr. Vol. II, 37-40 and Ex. 35R). Dr. Kavanaugh finds it significant that Petitioner's impulsivity, immaturity, and lack of disciplined parenting all occurred in an environment where Petitioner did not feel loved. (*See id.*). Petitioner's tolerance in his relationship with Cora, Dr. Kavanagh opines, shows

61

Petitioner's emotional immaturity and longing for an emotional connection with another person, as she was often belittling and inconsistent in how she treated him. (*See id.* at 42-46).

The letters Cora wrote to Petitioner between August 1998 and June 1999 while Petitioner was in prison for the burglary of the Johnson home are illustrative of the relationship between the two. (*See* Pet. Memo Ex. 54). In some of these letters, Cora expresses a desire to reconcile with Petitioner if he turns his life around by getting a job, a car, and a home. In others, she discusses her relationship with other men and tells Petitioner he will not be allowed to see her or the baby when he is released. Cora expresses her love and sexual desire for Petitioner in some letters, and in others, she informs Petitioner that he is inadequate. She writes about her new boyfriend, Harold Jackson, and about the frequency of their sexual encounters and his desire to marry her. In later letters, she expresses doubt about whether she wants to be with Harold, and reinforces the idea that she and Petitioner can be together if he will become a responsible provider. In a letter dated June 14, 1999, approximately two weeks before Petitioner was released from the RID program, Cora states that she wants to see Petitioner every day once he is released. (*See id.*).

Dr. Kavanaugh notes that Petitioner maintained contact with Cora despite being arrested because of something that involved her, and she notes that Cora was the only non-family member Petitioner listed on his inmate visit list. (Evid. Hr'g Tr. Vol. II, 44-45, Ex. BB). Dr. Kavanaugh notes that the letters written by Cora to Petitioner the month he is released indicate Cora's demands if Petitioner wished to be with her: get a job, a car, and a house. (*See id.* at 45-46). Dr. Kavanaugh observes that Petitioner got a job working twelve hour shifts when he was released from RID, but he experienced difficulty adjusting to his new freedom. (*See id.* at 46-47, Ex. 35EE). Dr. Kavanaugh opines that the emotional deprivation that Petitioner experienced earlier

62

in his life left him vulnerable to Cora, and that Cora and the child "became the focus of his idealized goal of having a family." (Evid. Hr'g Ex. 35, 13). Dr. Kavanaugh opines that the relationship, which Petitioner believed would fulfill his goal, was threatened on July 20, 1999, when he learned that Cora was with another man and refused to see him. (*See id.*). Dr. Kavanaugh concludes that the culmination of all the mitigating factors was that Petitioner felt unloved, had low self-esteem, and sought a relationship with Cora Johnson that he thought would provide that worth and value. (*See* Evid. Hr'g Tr. Vol. II, 50-51).

The Court also heard from four of Petitioner's family members at the federal evidentiary hearing. Despite the fact that Ms. Hodges was an excessive drinker who was hospitalized several times for acute alcohol intoxication, one of her daughters testified that she would not classify Ms. Hodges as having a drinking problem. (*See* Evid. Hr'g Tr. Vol. I, 84, 88). Although the record establishes that Ms. Hodges called the police on Petitioner's father on at least one occasion, initiated child support suits against him for years, and refused to comply with visitation orders, Wren Blair testified vaguely to "problems" with visitation and child support at times when Petitioner was young. (*See id.* at 98-102). Additionally, although he knew of Ms. Hodges excessive consumption of alcohol, selling liquor out of her home, Petitioner's chronic asthma, and the contentious custody/visitation arrangement, he stated at the hearing that he did not have information that he thought should have been shared with Petitioner's attorneys. (*See id.* at 110). Petitioner's niece, who lived with Petitioner and Ms. Hodges for a period of time, testified that although Ms. Hodges would get depressed sometimes, and she never heard Ms. Hodges tell Petitioner that she loved him or discuss things with him, that she was "good" with him. (*See id.* at 122-23).

63

The Fifth Circuit has held that "*Strickland* requires that we defer to counsel's decision not to present mitigating evidence or not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999). Where the decisions "do not serve any conceivable strategic purpose," no deference is required to the decision. *See id.* In *Moore v. Johnson*, the court stated that courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore*, 194 F.3d at 604.

In this case, trial counsel admittedly made no investigation concerning the sentencing phase of trial, and therefore, the Court finds that the omission or presentation of mitigating evidence was not based upon reasonable strategic decisions. *See Wiggins v. Smith*, 539 U.S. 510, 522-24 (2003) (The "principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgment' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Petitioner's] background *was itself reasonable*.") (internal citations omitted)). The lack of a meaningful investigation in this case, as well as a plan for the sentencing phase of trial, was based on a sheer failure to prepare. *See Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (noting difference between strategic judgment and plain omissions); *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2000) (no deference where demonstrated counsel "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client). That lack of a plan is apparent in the

64

opening statement given by co-counsel, Guy N. Rogers, Jr., at the sentencing phase of

Petitioner's trial:

> BY MR. ROGERS: Ladies and gentlemen, first of all, I want to thank you for your time and attention that you've given to this case.
> BY THE COURT: Ladies and gentlemen, it is improper for a lawyer to thank the jury. I will thank the jury for you. The State thanks you. The defendant thanks you, and the Court thanks you. You may proceed.
> BY MR. ROGERS: (Continuing)
> I want to say that it was your verdict and we respect that verdict. You've done that and I know that you've considered everything and were sincere and that is where we are now. This is kind of a new process that we're going through now.
> BY THE COURT: Mr. Rogers.
> BY MR. ROGERS: Yes, sir.
> BY THE COURT: Just tell the jury what your witnesses are going to say.
> BY MR. ROGERS: All right sir. I will do that.
> BY MR. ROGERS: (Continuing)
> Ladies and gentlemen, we are going to put on what we call mitigation proof, mitigating circumstances. We have witnesses that are going to testify and they are members of the defendant's family and that's usually what you have. These people are going to testify as to the defendant's background, about his life when he was a kid coming up. As you know, the law, of course, doesn't require you to return that penalty of death. You consider the mitigating and the aggravating factors, and as we told you earlier, even if the mitigators outweigh the aggravators - -
> BY THE COURT: - - You're arguing, Counsel.
> BY MR. ROGERS: Yes, sir.
> BY MR. ROGERS: (Continuing)
> Anyway, after this phase of the trial where we put on our mitigating and the District Attorney puts on his aggravating proof, then you will go back and consider what verdict that you're going to return. I would just ask that you listen closely to the mitigation proof and that you consider it very sincerely and I know that you will because you took an oath to do that. I would just ask when you go back there that you not put this defendant to death.
> BY THE COURT: Ladies and gentlemen, this is supposed to be an opening statement where they're going to tell you what they're going to offer. After the evidence is completed, then the Court will again give you jury instructions and then I will let the attorneys argue to you and try to convince you that their side is the correct side.

(*See* Trial Tr. Vol. 19, 938-39). At no point in defense counsel's opening statement did he point

65

to a single specific piece of mitigating evidence that would be presented for the jury's consideration.  He could not, because there was admittedly no theory of mitigation. (Evid. Hr'g Ex. 8, 96-97).

The fact that counsel did produce some witnesses in mitigation does not necessarily fulfill counsel's constitutional duty to investigate and present a case in mitigation.  *See Wiggins*, 539 U.S. at 527.  As the Fifth Circuit has noted, "[t]actical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."  *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990); *see also Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987).  The Court determines that the presumption of effective assistance with regard to trial counsel's performance at the sentencing phase of trial is objectively unreasonable in light of the admissions by trial counsel, and it also finds that counsel performed deficiently at the sentencing phase of trial.  *See Moore*, 194 F.3d at 617 ("Given that counsel's conduct in failing to develop or present mitigating evidence was not informed by any investigation and not supported by reasonably professional limits upon investigation, we find that there is no decision entitled to a presumption of reasonableness under *Strickland*.").

Given the fact that Dr. Merideth stated that the letters written from Cora to Petitioner would not have changed the opinions in his report, and that much of the testimony he might offer would have the potential to be adverse to Petitioner, the finding that counsel's failure to secure his testimony at trial was not deficient would not be problematic if it had been supported by any real investigation.  However, trial counsel stated into the record that he was unable to secure Dr. Merideth's presence at the sentencing hearing.  (*See* Trial Tr. Vol. 20, 932-33).  Counsel did not attempt to contact Dr. Merideth until two days into trial, and his communication with Dr.

66

Merideth about his availability to testify and the effect of the letters written from Cora to Petitioner consisted of a voicemail message. (*See* Trial Tr. Vol. 20, 932-34). At the start of the sentencing phase, Miller put in the record that he had in his possession the December 14, 2000, report from the Mississippi State Hospital at Whitfield that he was not seeking to introduce because he had no one to sponsor it. (*See* Trial Tr. Vol. 20, 932). There is no indication in the record that counsel actually discussed the mitigating factors with Dr. Merideth prior to or during trial. Defense counsel's contact with Dr. Merideth did not absolve counsel of the duty to develop a mitigation case through reasonable investigation and preparation. *See, e.g., Strickland*, 466 U.S. at 690-91 (holding that a strategic choice on an incomplete investigation is reasonable only to the extent that the limitation of investigation was itself reasonable).

Trial counsel made no investigation to determine how Petitioner's feelings of depression and anger and conflicted relationship with Cora might have had possible mitigating effect. He only knew that the letters from Cora to Petitioner did not change Dr. Merideth's reported opinion. Moreover, defense counsel did not attempt to seek an independent expert opinion, and testimony such as that offered through the reports of Dr. Wivott, Dr. Kavanaugh, and Dr. Zimmerman regarding Petitioner's emotional distress might have provided him with an entitlement to a statutory mitigating circumstance. *See* Miss. Code Ann. § 99-19-101(6)(b) (statutory mitigating circumstance that "[t]he offense was committed while the defendant was under the influence of extreme mental or emotional disturbance" ). Even had the trial court not found that Petitioner was entitled to the statutory mitigating circumstance, however, such professional testimony would have described Petitioner's emotional state with regard to Cora Johnson and provided an explanation for Petitioner's crime. From the beginning of trial, the

67

defense asserted that Petitioner killed Isaac Johnson, but that he had no intent to do so and was at the Johnson home to see his girlfriend. (*See, e.g.,* Trial Tr. Vol. 16, 547-550). The State's theory was that Petitioner was guilty of capital murder because he burglarized the Johnson home with the intent to commit an assault against Cora. (*See, e.g.*, Trial Tr. Vol. 16, 573-74; Trial Tr. Vol. 19, 917). The District Attorney also made it clear that Petitioner's "obsession and his intent" with regard to Cora was the "crux of the State's theory." (*See* Trial Tr. Vol. 15, 572). He characterized Petitioner's "obsession with this particular victim" as the heart of the case. (*See id.* at 574). The fact that lead counsel entered this case twenty-one days before trial notwithstanding, Petitioner did not present evidence to support a logical theory of mitigation.

Also unexplored at trial were the feelings of Bessie Tatum, the mother of the victim. Six days before trial, Miller informed the trial court that he had not read the entire court file. (Trial Tr. vol. 14, 42). Contained in that file was the November 16, 1999, victim impact statement signed by Ms. Tatum concerning Isaac's murder. (*See* Pet. Memo Ex. 45). In the statement, Ms. Tatum indicated that the court could impose a sentence of death if it wished, but that she did not "believe in killing" and would rather see Petitioner imprisoned for life. (*See id.*). Rogers stated in the deposition he gave during the course of federal habeas proceedings that he did not even know of the victim impact statement's existence. (*See* Evid. Hr'g Ex. 10, 32-33). Defense counsel did not attempt to contact Ms. Tatum before or during Petitioner's trial. (*See*, *e.g.*, Evid. Hr'g Ex. 31, 8).

The testimony that was elicited from mitigation witnesses was primarily generic, and trial counsel's failure to prepare witnesses to testify in mitigation opened the door to the admission of damaging testimony elicited from Lisa Hodges and Chris Hodges. On cross-examination of

68

these two mitigation witnesses, the prosecutor elicited testimony regarding Petitioner's two prior jail escapes, two burglary charges, and an attempted sexual battery charge. (*See* Trial Tr. Vol. 19, 949; 960-61). The prosecution also asked defense witnesses Sharon Green, Johnnie Hodges, and Petitioner about the prior charges. (*See id.* at 966-67; 984-85; 1010-1012). During the testimony of Chris Hodges, Petitioner's twenty-two year old nephew, the prosecution questioned Chris about Petitioner's school burglary and burglary/attempted sexual battery charges, thereby developing the idea that the Petitioner's trouble with law enforcement had nothing to do with Cora Johnson. (*See id.* at 957-61).

The Court recognizes that Mississippi allows evidence regarding unadjudicated crimes or prior bad acts as rebuttal evidence to the mitigation evidence put on by a defendant during the sentencing phase of a capital murder trial. *See Hansen v. State*, 592 So.2d 114, 148 (Miss. 1991); *Cole v. State*, 525 So.2d 365, 370 (Miss. 1987). However, counsel's re-cross of the witnesses after damaging information was elicited failed to include important facts to rebut the negative impact of that testimony. For instance, in response to the prosecutor's references to Petitioner's attempts to escape punishment, trial counsel did not elicit from Petitioner on re-direct that he turned himself in to law enforcement authorities the morning after Isaac's murder. Following testimony implicating Petitioner in another burglary and the sexual assault of Tasha Martin, trial counsel did not elicit from the witnesses or present testimony that those charges had been dropped by the alleged victim. (*See* Pet. Memo Ex. 4; Evid. Hr'g Ex. 33). Moreover, when Petitioner denied knowledge of additional indictments pending against him at the time of his 1998 guilty plea, the prosecutor was allowed to improperly introduce into evidence the two-count

indictment for burglary and the attempted sexual battery of Tasha Martin. (*See id.* at 1011-14).[22]

Before the testimony of the mitigation witnesses, the allegations of Petitioner's violent or otherwise bad acts were confined to his relationship with Cora Johnson. After cross-examination of these witnesses, however, the jury could have reasonably believed that Petitioner was a serial rapist and burglar who would escape prison and be a threat to the community at large if he were not sentenced to death. In assessing the issue of prejudice, the Court is mindful that the mitigating evidence in the affidavits and testimony from Petitioner's friends and family members is not so compelling as to be considered crucial to the jury's deliberations at sentencing. *See, e.g., Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005) (counsel performed deficiently in failing to contact treating physicians where client suffering from PTSD, organic brain disease, amnesia, where counsel aware of the conditions as basis for minimizing culpability). However, the statements of Petitioner's family members at the federal evidentiary hearing demonstrate the necessity of securing expert testimony in this case. Petitioner's family members had the opportunity to discuss their intended testimony with federal habeas counsel, yet their testimonies were still largely unhelpful to Petitioner. More importantly, the testimony offered was blind to the level of dysfunction that was present in the Hodges' home. The family's lack of awareness that a history of chronic poverty, parental conflict, excessive alcohol consumption, hospitalizations, lack of attention and support, etc., were relevant in mitigation undoubtedly had a profound impact on what testimony they offered, and it painted an unrealistic picture of what

---

[22]   Mississippi Rule of Evidence 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence."

life was like in the home.  An expert's testimony was necessary to give voice to the mitigating effect of conditions that were so commonplace to Petitioner's family as to seem insignificant.

Evidence existed, in the form of witness testimony, expert opinions, and the letters Cora wrote to Petitioner, to convincingly suggest to the jury that Petitioner was in a state of desperation on the night Isaac was murdered.  Providing a background to the relationship with Cora and an explanation of Petitioner's history as relevant to the offense was critical to an accurate sentencing determination in this case, as the State itself noted several times at trial that Petitioner's relationship with Cora was the "crux" of their theory.  Rather than take the evidence of the crime that was almost impossible to discount and attempt to explain the crime, defense counsel stumbled through a cursory examination of unprepared defense witnesses and opened the door to more damaging information.  With little to rebut the aggravating factors, and trial counsel's failure to fully develop or explain the relationship between Cora and Petitioner through unbiased testimony, there exists a distinct possibility that the jury, once it heard evidence that Petitioner broke into other people's homes and attempted to sexually assault them, and that he had twice escaped from custody, could have returned a verdict of death based upon considerations wholly inappropriate to a determination of whether Petitioner deserved a sentence of death for murder.

The Court notes that counsel's lack of a prepared, coherent mitigation case continued into closing argument.  Rogers attempted to argue to the jury that sentencing Petitioner to life imprisonment could meet the jury's concerns of protecting society and serving justice while simultaneously punishing him to a "horrible life" in a confined cell.  (*See* Trial Tr. Vol. 20, 1067-71).  Immediately following Rogers' closing, Miller argued.  He submitted to the jury that

Petitioner was going to die in prison or by the State's hands, and that the jury could "have it on y'alls shoulders or not." (*See id.* at 1072-73). He argued that prison was a fate worse than a sentence of death, and that if Petitioner was sentenced to death, it would "rest" on the jury. He stated:

> I wouldn't want to go upstairs. I believe in God. Ya'll don't have to. It's a free country. You can believe anything you want to. I wouldn't put down anybody's views, but I wouldn't want to go up to my Maker knowing that part of my decision in the name of the State caused the death of a man.

(*See id.* at 1073). The Court acknowledges that judicial review of a defense attorney's summation is "doubly deferential when it is conducted through the lens of federal habeas." *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). However, the argument presented to the jury was not merely a legitimate plea for mercy or residual doubt, but an offensive suggestion that following the law as provided by the court could possibly result in eternal damnation.

The Court finds that the numerous errors committed by trial counsel in this case deprived Petitioner of a fair trial with a reliable result. *See Strickland*, 466 U.S. at 687. Petitioner's lead counsel, hired less than a month before trial, had never tried a case in circuit court and has conceded that he was suffering from a mental breakdown at the time of trial.[23] Both lead and co-counsel failed to explore any mitigating evidence prior to trial. While attempting to elicit testimony from witnesses who testified only because they happened to be present, the jury heard otherwise inadmissible evidence about Petitioner's prior indictments for burglary and sexual assault. The jury was presented false testimony about the "break" given to Petitioner by Ms.

---

[23] The Court notes that both Miller and Rogers had a duty to Petitioner that was not met. Therefore, the Court does not consider Miller a "sacrificial lamb" as suggested by Respondents.

Tatum, and the jury never heard testimony that would explain Petitioner's emotional state at the time of the crime. Petitioner, by the actions and omissions of his own counsel, was portrayed as a dangerous, sexually deviant monster, and the prosecution made certain the jury knew that Petitioner had already been given leniency that he refused to acknowledge. All of this was compounded by the form of the verdict that misstated the realities of sentencing and told the jurors that if they did not sentence him to death, Petitioner could be released back into the community once again.

For all of the reasons recounted above, the Court specifically finds that it is objectively unreasonable to conclude that trial counsel made strategic judgments concerning Petitioner's case in mitigation of punishment. The Court also determines that a finding that Petitioner was not prejudiced as a result of trial counsel's performance involves an unreasonable application of the law governing the right to effective counsel. Therefore, the Court also specifically finds that counsel's deficient performance in the sentencing phase of trial prejudiced Petitioner, and that a reasonable probability exists that the jurors would have found that "the balance of aggravating and mitigating circumstances did not warrant death" had Petitioner been assisted by competent counsel. *Id.* at 695. The Court reaches its conclusion based upon specific errors it has explicitly found in the body of this opinion, as well as the cumulative effect of all of the errors committed by counsel at the sentencing phase of trial. *See, e.g.*, *Moore*, 194 F.3d at 619 (finding prejudice considering cumulative errors of counsel); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc) (cumulative effect of errors warrant relief where individual errors are of constitutional dimension, not procedurally defaulted, and they so infected the entire trial that the resulting conviction violates due process). Petitioner was denied the assistance of effective

73

counsel at the sentencing stage of his capital murder trial and is entitled to have his sentence of death vacated.

## Conclusion

The Court is convinced that Petitioner was denied the opportunity to have his jury make an accurate sentencing determination, and it is further convinced that the adversarial process critical to a fair trial was so lacking in this case as to render unreasonable the Mississippi Supreme Court's decisions regarding the assistance of counsel at the sentencing phase of trial. Specifically, the Court finds that the decisions of the Mississippi Supreme Court concerning the form of the verdict, the presentation of false evidence, and the effectiveness of counsel at sentencing constitute unreasonable applications of the clearly established federal law in these areas. Therefore, the Court hereby **ORDERS** that:

1. Relief on Petitioner's claims of (1) inaccurate parole instructions; (2) ineffective assistance of counsel at the sentencing phase of trial; and (3) the presentation of false/misleading evidence at the sentencing phase of trial is **GRANTED**, and this Court will issue a Writ of Habeas Corpus unless, within sixty days of the date the Judgment in this case becomes final, the State of Mississippi vacates Petitioner's death sentence and either initiates a new sentencing proceeding or imposes a sentence less than death.

2. Petitioner is **DENIED** an evidentiary hearing on his remaining claims.

3. All other federal habeas corpus relief requested by Petitioner is **DENIED**, and the remaining claims in the petition shall be **DISMISSED** with prejudice.

4. All pending motions are **DISMISSED** as moot.

5. Petitioner is **DENIED** a Certificate of Appealability on all claims raised in the petition not

related to the sentencing phase of his trial.

6. A separate Judgment in conformity with this Opinion and Order shall issue today.

      **SO ORDERED**, this the 13th day of September, 2010.


                         **/s/ MICHAEL P. MILLS**
                         **CHIEF JUDGE**
                         **UNITED STATES DISTRICT COURT**
                         **NORTHERN DISTRICT OF MISSISSIPPI**